ENVIRONMENTAL DEFENSE FUND, INC., the Ozark Society, Ark. Audubon Society, Inc., Ark. Ecology Center, Pratt Remmel, Jr., and Russell Harper, Plaintiffs,

v.

CORPS OF ENGINEERS OF the U. S. ARMY, Stanley R. Resor, Sec'y of the Army, and Gen. Frederick B. Clarke, Chief of Engineers, Corps of Engineers of the U. S. Army, Defendants.

No. LR-70-C-203.

United States District Court,
E. D. Arkansas, W. D.

Memorandum Opinion No. One
Nov. 16, 1970.

Memorandum Opinion Nos. Two and Three Dec. 22, 1970.

Memorandum Opinion No. Four
Jan. 21, 1971.

See also D.C., 325 F.Supp. 749.

Richard S. Arnold, Arnold & Arnold, Texarkana, Ark., Edward Lee Rogers, Stony Brook, N. Y., for plaintiffs.

W. H. Dillahunty, U. S. Atty., Little Rock, Ark., for defendants.

## MEMORANDUM OPINION NUMBER ONE

EISELE, District Judge.

The defendants have filed a Motion to Dismiss for Improper Venue for the following reasons:

"\* \* \* the project sought to be enjoined by the plaintiffs is wholly within the Western District of Arkansas; the District Engineer's office in charge of the proposed project is located in Tulsa, Oklahoma, and performs no work within the Eastern District of Arkansas, and the property involved \* \* \* lies within the Western District of Arkansas."

The complaint names the Corps of Engineers of the United States Army as a defendant along with Stanley R. Resor, Secretary of the Army, and General Frederick B. Clarke, Chief of Engineers, Corps of Engineers of the United States Army. It purports to set forth nine separate causes for equitable relief. The principal objective is to enjoin the making of any contract or the doing of any work in furtherance of the plan of the defendants to construct a dam across the Cossatot, a river located entirely within the Western District of the state of Arkansas. Although preliminary work appears already to have been performed on the over-all project, the construction of the dam, known as "Gillham Dam," has not yet commenced. In fact, no bids have been received or contracts awarded for the construction of the dam proper. Plaintiffs wish to keep the Cossatot as a free-flowing stream.

As the basis for their complaint the plaintiffs rely upon the Fifth, Ninth and Fourteenth Amendments to the United

States Constitution, and also rely upon various statutes enacted by the United States Congress, including: 42 U.S.C. § 1983; 42 U.S.C. § 4331 (the National Environmental Policy Act of 1969); 16 U.S.C. § 661 et seq. (the Fish and Wildlife Coordination Act of 1934); Public Law 91–224, Title II, 84 Stat. 114 (the Environmental Quality Improvement Act of 1970); 33 U.S.C. § 540; 43 U.S.C. § 390b (the Water Supply Act of 1958); 33 U.S.C. § 701a; 33 U.S.C. § 466a (the Clean Water Restoration Act of 1966); and 16 U.S.C. § 1271 et seq. (the *Wild and Scenic Rivers Act*).

The plaintiff Environmental Defense Fund, Inc. (EDF), is a non-profit, public-benefit membership corporation organized under the laws of the state of New York. The plaintiff Ozark Society, the plaintiff Arkansas Audubon Society, Inc., and the plaintiff Arkansas Ecology Center are all non-profit membership organizations established under the laws of Arkansas. The principal offices of the Ozark Society and the Arkansas Audubon Society are located in cities in the Western District of Arkansas. The principal office of the *Arkansas Ecology Center* is located at Little Rock in the Eastern District of Arkansas, Little Rock Division. Plaintiff Pratt Remmel, Jr., is a resident of Little Rock. Plaintiff *Russell Harper* resides at Gillham, Arkansas, in the Western District, and allegedly owns land on both sides of the Cossatot below the proposed dam site.

The plaintiffs seek to bring this suit as a class action under Rule 23.

The complaint does not state the residence of Stanley R. Resor, Secretary of the Army, or of General Frederick B. Clarke, Chief of the Corps of Engineers, but it is assumed that each resides in or around Washington, D. C., and, in any event, not within the Eastern District of Arkansas. The Complaint alleges that each of the defendants maintains an office in the Federal Office Building located at Little Rock, Arkansas, within the Eastern District of Arkansas.

Jurisdiction is predicated on 5 U.S.C. § 702 (review of agency action); 28 U.S.C. § 1331(a) (federal question); 28 U.S.C. § 1337 (regulation of commerce); 28 U.S.C. § 1343(3) (civil rights); 28 U.S.C. § 1361 (mandamus); and 28 U.S.C. §§ 2201–2 (declaratory judgments). Venue is alleged to exist by virtue of 28 U.S.C. §§ 1391(b) (jurisdiction not founded solely on diversity) and 1391(e) (1), (4) (actions against agencies, officers, and employees of the United States).

■ Although, as noted, plaintiffs allege venue under 28 U.S.C. § 1391(b), they rely in their brief solely upon § 1391(e). That section of the Judicial Code provides:

"A civil action in which each defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, may, except as otherwise provided by law, be brought in any judicial district in which: (1) a defendant in the action resides, or (2) the cause of action arose, or (3) any real property involved in the action is situated, or (4) the plaintiff resides if no real property is involved in the action."

Plaintiffs contend that venue is proper in the Eastern District of Arkansas for two independent and equally sufficient reasons: (1) that the Corps of Engineers of the United States Army resides here in every sense in which an agency of the United States can reside anywhere (it is admitted that the Corps of Engineers maintains an office in Little Rock which, however, does not have jurisdiction over the Gillham Dam project. That project is under the jurisdiction of the Corps's Tulsa office); and (2) that at least two of the six plaintiffs reside in the Eastern District of Arkansas.

The defendants contend, first, that the Corps of Engineers is not a "suable entity" and therefore can not be a resident of any district, and secondly, that this is an action involving real property and,

therefore, should be brought either where the individual defendants reside or in the Western District of Arkansas where the real property is situated. The plaintiffs argue that there is no "real property involved" in this action as is contemplated by § 1391(e) (3) or (4). They cite the legislative history of § 1391(e) which, they contend, restricts the concept of "real property involved in the action" to actions concerning the title to government lands or other legal interests therein.

In the opinion of the Court the question raised is not only novel but very close. On balance, the Court concludes that venue in the Little Rock Division of the Eastern District of Arkansas is proper, and, therefore, the motion of the defendants to dismiss for improper venue will be overruled.

The Court is not impressed with the plaintiffs' argument that the Corps of Engineers "resides" here in Little Rock, Arkansas, arguing by analogy to the concept of the residence of a business corporation for venue purposes. Nor does it appear that the plaintiffs can sue the Corps of Engineers unless, indeed, § 1391 (e) is itself interpreted to confer such authority and, in effect, to waive the principle of sovereign immunity with respect to all "agencies" of the United States. Such does not appear to have been the intent of § 1391(e).

The Court is of the opinion that this is not an action in which "real property is involved" in the sense contemplaetd by § 1391(e) (4). There is nothing that needs to be done to accomplish the objectives of the plaintiffs which can not be as readily done by this Court as that which could be done by, say, the District Court in Washington, D. C., had the plaintiffs filed there as permitted by § 1391. Indeed, if the plaintiffs here were limited to individual citizens residing in the Eastern District of Arkansas, it is very doubtful, in the Court's opinion, that venue would lie in the Western District because no "real

property involved in the action," under the Court's analysis, is situated there. Nothing needs to be done in this action with respect to the real estate under and adjacent to the Cossatot or upon which defendants contemplate constructing the Gillham Dam. The action does not put in issue the title to, or possession of, such lands, or any interest therein.

Section 1391(e), enacted in 1962, was intended to liberalize the venue requirements. It should be interpreted to effectuate this objective.

There is one problem, not mentioned by the parties, which should be pointed out. Section 1391(e) (4) mentions *"the* plaintiff." Here at least one of the plaintiffs resides in New York state. In order to give the section the effect which the Court has given to it in its analysis above, the word "the" must be read as "a" or "one or more." The Court can think of no objective which the Congress might have had in limiting 1391(e) (4) to either single-plaintiff cases or to only those multiple-plaintiff cases where all of such plaintiffs reside in the judicial district of the forum.

The motion to dismiss will be overruled and the plaintiffs' motion for a preliminary injunction is set for a hearing at 9:30 a. m. Tuesday, November 24, 1970.

## MEMORANDUM OPINION NUMBER TWO

This is the second memorandum opinion in this proceeding, the first having been filed on November 16, 1970, with respect to the venue issue.

The matter now before the Court is the defendants' motion to dismiss, filed November 24, 1970, the date upon which the plaintiffs' application for temporary injunctive relief was heard.[1]

Defendants' motion is based upon the Court's alleged lack of jurisdiction over the defendants and the subject matter, and also asserts that the various plaintiffs lack standing and that the complaint

---

1. The hearing lasted through November 25, 1970.

fails to state a claim upon which relief can be granted.

The defendants contend in their memorandum, first, that "this action must be dismissed because it is an unconsented-to suit against the sovereign," and they cite United States v. Sherwood, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941); Dalehite v. United States, 346 U.S. 15, 30, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); Lynch v. United States, 292 U.S. 571, 581, 582, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); and Blackmar v. Guerre, 342 U.S. 512, 72 S.Ct. 410, 96 L.Ed. 534 (1952), among others.

The United States of America is not named as a defendant herein but the Corps of Engineers of the United States Army is. The Court believes that this action should be dismissed as to the Corps of Engineers of the United States Army, but it is not necessary for it to make the final determination on this issue at this time. See the Court's first memorandum on the question of venue.

■ It appears clear to the Court that the complaint states a cause of action against Stanley R. Resor, Secretary of the Army, and General Frederick B. Clarke, Chief of the Corps of Engineers of the United States Army, and that the suit is not barred by the doctrine of sovereign immunity. Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), simply does not apply where the complaint alleges that the actions or omissions of the designated officials of the United States are ultra vires, either because they are outside of the scope of their statutory powers or, if within same, it is nevertheless claimed that the exercise thereof would be unconstitutional. As stated in Dugan v. Rank, 372 U.S. 609, 621, 622, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), there are recognized exceptions to the *Larson* rule:

"Those exceptions are (1) action by officers beyond their statutory authority and (2) even though within the scope of their authority, the powers themselves or the manner in which

they are exercised are constitutionally void."

The Court then pointed out that, in such cases, " * * * the officer's action 'can be made the basis of a suit for specific relief against the officer as an individual * * *.' ", citing Malone v. Bowdoin, 369 U.S. 643, 647, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962). The complaint herein clearly alleges that the actions of the individual defendants are illegal and ultra vires, and that said defendants are threatening further such acts. The complaint then goes into considerable detail in setting forth specific statutes and constitutional provisions which, the plaintiffs claim, the named defendants have been, and are, violating.

Jurisdiction over the named defendants may not finally be determined until the conclusion of the case on its merits. The Court, in determining if those defendants acted within their constitutional and statutory authority, will, in part, also be determining the issue of jurisdiction. For the time being, however, the complaint adequately avers proper bases for the jurisdiction of this Court, both over the named defendants and of the subject matter. The "subject matter" aspect of jurisdiction has been partially dealt with in the Court's prior memorandum on venue.

■ The defendants further argue in their memorandum that "the plaintiffs have no standing to bring this action." This question presents the Court with considerable difficulty with respect to five of the plaintiffs.

There are six plaintiffs in this case: the Environmental Defense Fund (EDF), alleged to be a non-profit, public-benefit membership corporation organized under the laws of the state of New York, which exists for various purposes, including "to protect and enhance the natural environment including * * the preservation of scenic rivers * * *" (paragraph 2 of the complaint); the Ozark Society, a non-profit membership organization formed under the laws of the state of Arkansas, among the pur-

poses of which are the promotion of the knowledge and enjoyment of the "scenic * * * ecological * * * recreational and esthetic qualities of the Ozark-Ouachita region and to secure and preserve these qualities for present and future generations" (paragraph 3 of the complaint); Arkansas Audubon Society, Inc., a non-profit membership corporation organized under the laws of the state of Arkansas, among the purposes of which are the fostering of "knowledge of the natural history of Arkansas" and the conservation of "all the natural resources of Arkansas" (paragraph 4 of the complaint); Arkansas Ecology Center, a non-profit membership corporation organized under the laws of the state of Arkansas, the purpose of which is "to work for the improvement of the Arkansas environment in all of its aspects by * * * participating in litigation * * *." (paragraph 5 of the complaint); Mr. Pratt Remmel, Jr., a resident of Little Rock, Arkansas, who has "floated, fished and otherwise derived benefit from the Cossatot River in its natural state, and wishes to preserve and enhance the said river and protect its fish and the quality of its waters" (paragraph 6 of the complaint); and Mr. Russell Harper, a resident of Gillham, Arkansas, who owns land on both sides of the Cossatot River below the proposed dam site (paragraph 7 of the complaint). Although the question is close and difficult with respect to all of the plaintiffs except Mr. Russell Harper, the Court nevertheless concludes that at least five of said plaintiffs have standing to bring and maintain this suit.

Who are the non-individual plaintiffs? They are all non-profit organizations composed of members who have a sincere and vital common interest in protecting those environmental values which they deem to be most important to this, and future, generations of American citizens. It is true that they have no direct private and personal economic interest in the Cossatot River or the lands lying adjacent thereto; but these organizations wish to represent what they deem to be the "public" interest in this river and its environs. Each of the organizations has demonstrated its interest in such matters as that represented by this lawsuit.

The law of standing has developed considerably since 1965. In that year, the Second Circuit decided Scenic Hudson Preservation Conf. v. FPC 354 F.2d 608 (2d Cir. 1965), cert. denied, Consolidated Edison Co. of New York, Inc. v. Scenic Hudson Preservation Conference, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966), which upholds the standing of such unincorporated associations to challenge the exercise of federal power (there, the granting of a license by the FPC) on esthetic, conservational and recreational grounds, i. e., on other than direct economic interest grounds.

In the recent case of Association of Data Processing Serv. Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), Justice Douglas suggested two tests: (1) Does the plaintiff allege that the challenged action will cause him "injury in fact, economic or otherwise"? (397 U.S. at 152, 90 S.Ct. at 829); (2) Is the interest sought to be protected "within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question?" Justice Douglas cites *Scenic Hudson* as authority that the legal interest required " * * * at times may reflect 'esthetic, conservational and recreational' as well as economic values." He mentions non-economic values, " * * * to emphasize that standing may stem from them as well as from * * * economic injury * * *." Justice Brennan, although concurring in the result of *Data Processing*, dissented from Justice Douglas' treatment of the question of standing to challenge agency action.[2] He reasoned that the first test of Justice Douglas, men-

2. Dissent found in companion case of Barlow v. Collins, 397 U.S. 159, 167, 90 S.Ct. 832, 25 L.Ed.2d 192 (1969).

tioned above, was the only one that need be made to determine standing. He feels that the second test addresses itself more appropriately to the question of "reviewability" than to standing. To him, the "zone of interest" test is another way of asking whether Congress meant to deny or to allow judicial review of agency action at the instance of the particular plaintiff. But on the question of standing at issue here, Justice Brennan obviously agrees that the injury involved need not be economic. In a footnote he states:

"Thus, for purposes of standing, it is sufficient that a plaintiff allege *damnum absque injuria*, that is, he has only to allege that he has suffered harm as a result of the defendant's action. Injury in fact has generally been economic in nature, but it need not be. See, *e. g.*, Scenic Hudson Preservation Conf. v. FPC, 354 F.2d 608 (C.A.2d Cir. 1965); Office of Communication of United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 359 F.2d 994 (1966). The more 'distinctive or discriminating' the harm alleged and the more clearly it is linked to the defendant's action, the more easily a plaintiff may meet the constitutional test. See L. Jaffe, Judicial Control of Administrative Action 501 (1965). The plaintiffs in the present cases alleged distinctive and discriminating harm, obviously linked to the agency action. Thus, I do not consider what must be alleged to satisfy the standing requirement by parties who have sustained no special harm themselves but sue rather as taxpayers or citizens to vindicate the interests of the general public."

The difficulty arises out of the last quoted sentence from the footnote to Mr. Justice Brennan's opinion and the recent decision of the Ninth Circuit in Sierra Club v. Hickel, 433 F.2d 24 (9th Cir. 1970).

In the *Sierra Club* case, the plaintiff, a conservation club, sought a declaratory judgment and an injunction barring the issuance of permits which would allow Walt Disney Productions, Inc., to implement a plan for a commercial development in the Mineral King Valley of the Sequoia National Forest in California. The plaintiffs contended that the issuance of such permits for the construction of improvements would be in excess of the Secretary of Agriculture's authority, and also that the issuance of permits by the Secretary of the Interior for the construction of roads and electrical transmission lines on the park land would be illegal thus avoiding *Larson, supra*. But when it got to the standing problem the Court stated:

"The complainant does not assert that any of its property will be damaged, that its organization or members will be endangered or that its status will be threatened. Certainly it has an 'interest' in the sense that the proposed course of action indicated by the Secretaries does not please * * * all or a substantial number of its members. It would prefer some other type of action or none at all. * * *

"We do not believe such club concern without a showing of more direct interest can constitute standing in the legal sense sufficient to challenge the exercise of responsibilities on behalf of all of the citizens by two cabinet level officials of the government acting under congressional and constitutional authority. * * * *"

The Court in *Sierra Club* was well aware of the *Data Processing* case. It referred thereto and pointed out that, in that case, there was "direct injury in fact."

It is true that the language in *Data Processing*, on which the plaintiffs rely here, is dicta, and it can be argued that such language, even going back to the *Scenic Hudson* case, was unnecessary to the particular decisions because of the facts of such cases. Nevertheless, the Court agrees with the dissent in the *Sierra Club* case, because the rationale of *Data Processing* and the other Supreme Court decisions, if not the precise holdings, clearly indicates that such plaintiff organizations as those involved in such cases have standing to sue. There can be

no doubt that the corporate plaintiffs are interested and antagonistic enough to present the issues vigorously and with the "concrete adverseness" referred to in Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). See also Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Furthermore, at least one of the acts relied upon by the plaintiffs, the National Environmental Policy Act of 1969, makes clear the recognition by Congress of the important role of such private organizations by requiring all federal agencies to cooperate with "concerned * * * private organizations" to further the policies of the Act.

In Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 428 F. 2d 1093 (1970), an action to review a determination by the Secretary of Agriculture not to suspend at once all use of DDT, the injury alleged was the biological harm to man and other living things resulting from the Secretary's failure to act. The Environmental Defense Fund, Inc., was one of the petitioners there, as it is here. Other petitioners in the *Hardin* case included the National Audubon Society, the Sierra Club, the West Michigan Environmental Action Council, and the Isaac Walton League of America. The District of Columbia Circuit Court clearly upheld the standing of such organizations to maintain the suit. Whether under the reasoning of *Hardin* and *Data Processing*, or under the theory of the use of "private attorney generals" to protect the public interest, Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97 (2d Cir. 1970), the private membership organizations here have standing.

The plaintiff Pratt Remmel, Jr., is the Executive Director of the plaintiff Arkansas Ecology Center. He lives in Little Rock and alleges a personal interest in that "he has floated, fished and otherwise derived benefit from the Cossatot in its natural state and wishes to preserve and enhance the said river and protect the quality of its fish and its waters." The standing of Mr. Remmel in his individual capacity is extremely doubtful under the law. The right of individual citizens to raise general issues affecting the public as a whole is not clear, although there is a tendency to recognize and encourage action by individual private citizens to vindicate certain declared public policies. See, for example, "Qui Tam Actions and the 1899 Refuse Act: Citizen Lawsuits Against Polluters of the Nation's Waterways," prepared by the subcommittee's staff of the Conservation and Natural Resources Committee of the House, which was transmitted to the Committee on Government Operations of the House on August 13, 1970, and published in September (Government Printing Office designation: 49–325 O). The Court will not make a final determination as to Mr. Remmel's standing at this time.

■ It is clear that the plaintiff Russell Harper has standing in the traditional sense because he alleges a personal, direct economic interest and claimed, in his testimony, that the value of his land was increased by the periodic flooding and, therefore, that the construction of the dam would injure him economically.

The complaint purports to set forth a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. The Court will permit the plaintiff non-profit membership organizations to bring this action on behalf of the active members of such organizations who, the Court finds, are too numerous to be joined individually. The Court, however, will require said plaintiff organizations to notify their members of the pendency of this action and of the legal positions being taken in the case by such organizations. The Court at this time does not prescribe any particular method of notification but directs said plaintiffs to file with the clerk of this court a statement of the manner in which they have complied with this directive not later than 30 days from the date hereof. The Court will thereafter pass upon the sufficiency of the notice given. The Court does not at this time enlarge the class to include

those referred to in paragraph 8(b) of the complaint.

■ The plaintiffs set forth nine so-called "causes of action" in their complaint. The Court does not intend at this time to analyze the legal bases of the various causes. Pending before it is the plaintiffs' application for a temporary injunction. It is sufficient at this juncture for the Court to determine if the plaintiffs have stated any claim upon which relief can be granted.

It is not necessary for the Court to go beyond the "First Cause of Action" set forth in the complaint in order to conclude that the plaintiffs have alleged a claim upon which they may be entitled to certain relief. That cause of action is based upon the alleged failure of the defendants to comply with the requirements of the National Environmental Policy Act of 1969, 42 U.S.C. § 4331 et seq. A discussion of that Act and the bases for the other claims by the plaintiffs can be best deferred until the Court considers the pending application for a temporary injunction.

The Court concludes that the defendants' motion to dismiss, filed November 24, 1970, should be overruled and an order has accordingly this date been entered.

The Court will proceed in the immediate future to take up the issue of temporary injunctive relief.

## MEMORANDUM OPINION NUMBER THREE

Mr. Richard S. Arnold
Attorney at Law
Arnold & Arnold
P. O. Box 1938
Texarkana, Arkansas 75501

Mr. Edward Lee Rogers
Attorney at Law
P. O. Drawer 740
Stony Brook, New York 11790

Mr. W. H. Dillahunty
United States Attorney
P. O. Box 1229
Little Rock, Arkansas 72203

Gentlemen:

Re: Environmental Defense Fund, Inc., et al. v. Corps of Engineers, et al.

No. LR–70–C–203

Enclosed you will find a copy of the order overruling the defendants' motion to dismiss, together with a copy of Memorandum Opinion Number Two, which has been filed in connection therewith.

This letter will constitute the third memorandum in connection with this proceeding. It deals with the plaintiffs' application for a temporary injunction.

The Court has concluded, pursuant to Rule 65(a) (2) of the Federal Rules of Civil Procedure, that the plaintiffs' application for a preliminary injunction, and the evidence received by the Court on November 24–25, 1970, in relation thereto, should be consolidated with the hearing upon the merits of the case, and that the trial of the action upon the merits should be advanced, to the end that a final decision herein can be rendered in the very near future.

The Court is hereby scheduling a hearing upon the merits to commence at 10:00 a. m. Monday, February 8, 1971, and is setting aside three days for this purpose. The evidence received on the application for a preliminary injunction, which is admissible upon the trial on the merits, will automatically become a part of the record and need not be repeated at the trial.

The Court believes that the parties are entitled to a comprehensive statement of the Court's attitude toward the case at the present time.

The parties agree as to the test to be applied in determining whether to issue a preliminary injunction. It is, as stated by the Eighth Circuit Court of Appeals in Benson Hotel Corp. v. Woods, 168 F.2d 694, 697 (8th Cir. 1948), as follows:

"[a] temporary injunction should usually be granted where the questions presented are grave and injury to the moving party will result if it is denied and the final determination should be in his favor, while if it is

granted and the decision is unfavorable the inconvenience and loss to the opposing party will be inconsiderable. Ordinarily the Court in its discretion may grant a preliminary injunction where it appears that there is a substantial controversy between the parties and that one of them is committing an act or threatening the immediate commission of an act that will cause irreparable injury or destroy the status quo of the controversy before a full hearing can be had on the merits of the case, and generally such an injunction will be granted whenever necessary to the orderly administration of justice."

█ The Court has concluded that there is a substantial controversy between the parties and, further, that at least in one respect (see *infra*) there is a reasonable probability that the plaintiffs will succeed after final hearing upon the merits, unless, prior thereto, the defendants voluntarily take certain administrative action as discussed below. However, the Court notes from the defendants' answer that, although bids will be opened on December 22, 1970, defendants do not contemplate awarding a contract for the construction of the embankment or for the clearing of the lake area prior to January or February, 1971. Since it does not appear, therefore, that the defendants are committing or threatening the immediate commission of any act that will cause irreparable injury to the plaintiffs or which would destroy the status quo before a full hearing can be had upon the merits of the case, the Court has concluded that it would not be justified in entering a temporary injunction at this time. The Court, however, requires the defendants to keep it currently advised with respect to all of its contemplated actions concerning that part of the public-works project entitled "Millwood Reservoir and Alternate Reservoirs, Little River, Oklahoma and Arkansas" which in any way relate to, or pertain to, the proposed Gillham Dam project or to the Cossatot River. Should the Court at any time be advised that the defendants plan to award contracts, or to take other action with respect to this matter, prior to the scheduled hearing upon the merits, appropriate preliminary relief will be considered by the Court to the extent needed to prevent irreparable injury or to preserve the status quo.

The Court wishes to make clear, initially, that the pendency of this action should not be considered, in any way, as limiting the authority of the defendants to proceed administratively in order to fully comply with any requirement of law.

As the Court views this case, the ultimate decisions must be made not by the judiciary but by the executive and legislative branches of our government. This Court does not intend to substitute its judgment as to what would be the best use of the Cossatot River and its environs for that of the Congress or those administrative departments of the executive branch which are charged by the Congress with the duty of carrying out its mandate. The role of the Court is simply to require compliance with the laws enacted by the United States Congress.

█ It is true that the plaintiffs seek relief under the Fifth, Ninth and Fourteenth Amendments to the Constitution of the United States and under 42 U.S.C. § 1983. Looking at the latter contention first, it is the Court's view that the plaintiffs' allegations under their "Ninth Cause of Action" form an inadequate basis for restraining the defendants under section 1983 from constructing the embankment across the Cossatot. The role of the Tri-Lakes Water District— the plaintiffs' predicate for state action —is such that it has no power or control over the construction of the dam. The argument is makeweight. This is a federal project being pursued under federal law and the plaintiffs are not threatened in any significant way by any action under color of state law. No state agency, or agency acting under color of state law, is even named as a defendant in the case.

█ The Court is not insensitive to the positions asserted by the plaintiffs in

their "Seventh Cause of Action." There, they contend:

> "The right to enjoy the beauty of God's creation, and to live in an environment that preserves the unquantified amenities of life, is part of the liberty protected by the Fifth and Fourteenth Amendments to the Constitution of the United States * * * and is also one of those unenumerated rights retained by the people * * * as provided in the Ninth Amendment * * *."

Those who would attempt to protect the environment through the courts are striving mightily to carve out a mandate from the existing provisions of our Constitution. Others have proposed amendments to our Constitution for this purpose. See Toward Constitutional Recognition of the Environment, 56 A.B.A.J. 1061 (Nov. 1970). Such claims, even under our present Constitution, are not fanciful and may, indeed, some day, in one way or another, obtain judicial recognition. But, as stated by Judge Learned Hand in Spector Motor Serv., Inc. v. Walsh, 139 F.2d 809 (2 Cir., 1944):

> "Nor is it desirable for a lower court to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant."

The Ninth Amendment may well be as important in the development of constitutional law during the remainder of this century as the Fourteenth Amendment has been since the beginning of the century. But the Court concludes that the plaintiffs have not stated facts which would under the present state of the law constitute a violation of their constitutional rights as alleged in the "Seventh Cause of Action" in their complaint. The Court's decision on this point gives further emphasis to its statement, *supra,* that final decisions in matters of this type must rest with the legislative and executive branches of government.

The only "cause of action" with respect to which the Court believes that the plaintiffs will probably prevail at the hearing upon the merits (unless the defendants prior thereto take certain administrative action) is that characterized as the "First Cause of Action" in the complaint—that is, the claim arising under, and by virtue of, the National Environmental Policy Act of 1969, 42 U.S.C. § 4331 et seq. The Court should point out, however, that the plaintiffs also made a substantial showing at the November 24–25 hearing with respect to the alleged non-compliance of the defendants with the provisions of section 2(b) of the Fish & Wildlife Coordination Act of 1934, 16 U.S.C. § 662(b).

However, for many reasons, the Court is doubtful that such non-compliance, if any, could form a legal basis upon which plaintiffs could obtain relief here. Furthermore, it is unreasonable to require defendants to go back through the processes required by section 2(b) of the Fish and Wildlife Act of 1934 at this time (some 13 years after the fact) and, particularly so, if the Court reads the NEPA of 1969 correctly. It is the Court's view that, if defendants comply with the provisions of the latter Act in good faith, they will automatically take into consideration all of the factors required by the Fish and Wildlife Act and it is not reasonable to require them to do both separately. Certainly it would take a much stronger showing at the hearing upon the merits to convince the Court to the contrary.

The same may be said with regard to the plaintiffs' "Third Cause of Action" predicated upon 33 U.S.C. § 540, which requires that "federal improvements of rivers * * * shall include a due regard for wildlife conservation." Indeed, plaintiffs allege in paragraph 47 of their complaint that "this requirement of 'due regard for wildlife conservation' is one of the national policies underlying NEPA and the Environmental Protection Act of 1970."

The Court does not believe that the plaintiffs have stated a claim for which relief can be granted under its

"Fourth Cause of Action" based upon 33 U.S.C. § 701(a). It is for the Congress to determine, in authorizing such a project and in, thereafter, making subsequent appropriations therefor, whether the benefits are "in excess of the estimated costs." The Court does not believe that it has the authority to enjoin the expenditure of appropriated funds upon a showing that the benefits are less than the estimated cost. The plaintiffs and others are free to bring such matters to the attention of the legislative branch at the time any new appropriation for this project is proposed. Indeed, they could bring the matter to the attention of Congress at this time with the hope of obtaining legislation which would prevent the expenditure of funds *already* appropriated (which would obviously include those needed for the construction of the dam proper and the clearing of the lake). The methods of calculating cost-benefit ratios are innumerable and in many cases esoteric. The Court's judgment as to sound procedures in this regard might well not be in accord with the judgment of Congress. And, as stated above, the Court does not believe it should, in any event, attempt to substitute its judgment for that of the legislature.

The general comments which the Court has made with respect to the plaintiffs' "Fourth Cause of Action" can be made with respect to the "Fifth Cause of Action" (predicated upon section 301(b) of the Water Supply Act of 1958 as amended by section 10 of the Water Pollution Control Act Amendments of 1961, 43 U.S.C. § 390b(b)), and the "Sixth Cause of Action" (which contends that the defendants are not entitled to justify the project by claiming an annual financial benefit from "water quality control"), since, they contend, the Clean Water Restoration Act of 1966, 33 U.S.C. § 466a(b) (1), does not apply to the Cossatot since there is no pollution discharged into same of any consequence.

The plaintiffs' "Eighth Cause of Action" asserts that the defendants, although requested by the Council on Environmental Quality to do so, had not prepared and delivered the impact statement required by NEPA. However, such a statement was filed after the commencement of the action and its sufficiency will be discussed in connection with the analysis of plaintiffs' "First Cause of Action," *infra*. The Court is therefore dismissing plaintiffs' fourth, fifth, sixth, seventh, eighth and ninth causes of action and intends that the plaintiffs shall have the immediate right of appeal with respect to such dismissal order and with respect to the Court's refusal to enter any temporary injunction with respect to such causes.

The Court has expressed serious doubts as to the plaintiffs' rights under their "Second Cause of Action" and "Third Cause of Action," but reserves final determination upon these issues pending the hearing upon the merits.

Because of the Court's interpretation of the NEPA of 1969, much of the evidence which the plaintiffs might have introduced with respect to the dismissed causes of action would obviously be relevant to the issues raised in plaintiffs' "First Cause of Action."

The parties are entitled to have a memorandum incorporating the Court's findings of fact and conclusions of law which form the basis for the Court's conclusion, stated earlier in this letter, that the plaintiffs would be entitled to a preliminary injunction on the pleadings and the proof, were it not for the fact that there is no evidence that the defendants are committing, or are threatening the immediate commission, of any act that would cause said plaintiffs irreparable injury or which would destroy the status quo prior to the hearing upon the merits which has now been scheduled for February 8, 1971. However, since time is of the essence, the Court will send this letter memorandum to the parties today, and will make the effort to file the appropriate findings of fact and conclusions of law with respect to the plaintiffs' "First Cause of Action" before the first of the year. The Court is fol-

lowing this course because it wants the parties to have the earliest possible notice of its decision. This will allow all parties to prepare immediately for the hearing upon the merits and will permit the defendants to take such administrative action as they may deem appropriate under the circumstances. By following this procedure, it is hoped that the entire matter can be disposed of before any prejudice results to the parties or to the public, whose interest is also clearly involved in this proceeding.

An order will be entered pursuant hereto and, also, pursuant to the findings and conclusions with respect to plaintiffs' "First Cause of Action" at the time the latter are filed.

Very truly yours,

(s) G. Thomas Eisele

G. Thomas Eisele

United States District Judge

## MEMORANDUM OPINION NUMBER FOUR

This will constitute the Court's fourth memorandum filed in connection with this proceeding. It deals with the plaintiffs' "First Cause of Action" insofar as that cause of action forms the basis of the application for temporary injunctive relief. The Court had planned to cover this matter in its third memorandum dated December 22, 1970, but other pressing matters intervened and the Court, reasoning that the parties would want the earliest possible notice of its decision upon the application for temporary injunctive relief, entered its order at that time, postponing until now the making of its findings of fact and conclusions of law with respect to plaintiffs' "First Cause of Action." For this latter purpose, the Court will consider the "general allegations" contained in paragraphs 14 through 20 of the complaint; the allegations with respect to "The Gillham Dam Project" contained in paragraphs 21 through 27; and the "First Cause of Action" set forth in paragraphs 28 through 37, all in the light of the evidence presented at the hearing on November 24 and 25, 1970.

Plaintiffs contend: that the defendants are required by the National Environmental Policy Act of 1969, 42 U.S.C. § 4331 et seq. (hereinafter referred to as NEPA), to interpret and administer their policies and regulations, and all public laws affecting them, in accordance with the provisions of that act; that the Environmental Quality Improvement Act of 1970, PL 91–224, requires the defendants to implement the policies "established under existing law" including the "national policy for the environment which provides for the enhancement of environmental quality;" that the policies set forth in NEPA include "the continuing policy of the federal government, in cooperation with state and local governments, * * * to use all practicable means and measures * * * to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations;" that NEPA requires the defendants to "use all practical means, consistent with other essential considerations of national policy, to improve and coordinate federal plans, functions, programs and resources," (which, plaintiffs contend, includes the plan and program for construction of dams on the tributaries of the Little River), "to the end that the nation may * * * (3) attain the widest range of beneficial uses of the environment * *; [and] (4) preserve historic cultural and natural aspects of our national heritage and maintain, wherever possible, an environment which supports diversity and variety of individual choice * * *;" that section 102(2) of NEPA, 42 U.S.C. § 4332(2) requires that all agencies of the federal government shall:

"(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision-making which may have an impact on man's environment;

"(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by sub-chapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

"(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

"Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

"(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;"

that there are no "essential considerations of national policy" that require the construction of the Gillham Dam project; that the defendants, in their consideration of the dam and alternatives thereto, have not used "all practical means * * * to the end that the nation may * * * maintain, wherever possible, an environment which supports diversity and variety of individual choice * * ;" that the defendants have not studied, developed nor described appropriate alternatives to the damming of the Cossatot such as the alternative of preserving selected rivers in their free-flowing condition in accordance with the policy of Congress stated in the Wild and Scenic Rivers Act; that the value of the Cossatot as a free-flowing river is a "presently unquantified environmental amenity or value" which has not been given appropriate consideration by defendants in their decision-making along with economic and technical considerations; and that the defendants have failed and refused to comply with the provisions of NEPA and the Environmental Quality Improvement Act of 1970, and will, unless restrained by the Court, persist in completion of the Gillham Dam project in violation of the provisions of said act.

With respect to the plaintiffs' "First Cause of Action," the defendants take the position that NEPA does not apply, and, if it does apply, that they have complied therewith. With respect to the latter contention, it should be noted that a statement in purported compliance with section 102(2) (C) of NEPA was filed by the defendants on October 5, 1970, after the commencement of this suit.

Before going into the facts the Court will take up the defendants' contention that the provisions of NEPA do not apply to this project. Their position is that this project was authorized in 1958 and is approximately 63 per cent complete, and that to invoke the provisions of NEPA here would require a "retroactive" or "retrospective" application of its provisions, which, they further contend, was not the intent of the Congress.

It is true that the language in certain district court opinions would appear to give weight to the government's contention. See, *e. g.,* Investment Syndicates, Inc. v. Richmond, Adm'r., Bonneville Power Administration, U. S. District Court, Ore., 318 F.Supp. 1038, filed October 27, 1970. But here the plaintiffs are not asking the Court to set aside or undo any prior action on the part of the defendants. Rather they are seeking an application of prevailing, existing law related to anticipated future actions of the defendants. This principle was applied in Zabel v. Tabb, 430 F.2d 199 (5th Cir. 1970) to uphold a decision by the Corps of Engineers.

The language and legislative history of NEPA indicate that Congress intended that it apply to exactly such situations as that presented here. The act clarifies congressional policy and imposes an obligation upon the defendants to protect the environment in planning and in conducting their lawful activities. Section 101(a) of the act declares it to be "the *continuing* policy of the federal government" to protect the environment, and section 101(b) declares it to be "the *continuing* responsibility of the Federal Government to * * * *improve* and coordinate federal plans, functions and resources to accomplish that objective." (Emphasis supplied.) So, while new plans and programs must be structured from the outset in accordance with the requirements of NEPA, it is also clear that the act requires the defendants to "improve" or upgrade existing plans and programs to meet those requirements. Further, section 102 of NEPA states that "the Congress authorizes and directs that, to the fullest extent possible: (i) the policies, regulations and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act * * *." The language "to the fullest extent possible" can hardly be considered ambiguous. The legislative history behind such language is stated in H.Rep. No. 91–765, 91st Cong., 1st Sess., 2 U.S.C.Cong. and Adm.News (1969), p. 2770, as follows:

> " * * * to make it clear that each agency of the federal government shall comply with the directives set out in such subparagraphs (A) through (H) [of section 102] unless the existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of the directives impossible * * * The language in section 102 is intended to assure that all agencies of the federal government shall comply with the directives set out in said section 'to the fullest extent possible' under their statutory authorization and that no agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance."

There is nothing in the statutory authorization of the Gillham Dam which prohibits compliance with NEPA with regard to future actions affecting that project.

Finally, the Council on Environmental Quality, created by NEPA, issued, on April 30, 1970, "interim guidelines" which provide, *inter alia:*

> "*Application of Section 102(2) (C) Procedure to Existing Projects and Programs.* To the fullest extent possible the section 102(2) (C) procedure should be applied to further major federal acts having a significant effect on the environment even though they arise from projects or programs initiated prior to the enactment of [NEPA]. Where it is not practicable to reassess the basic course of action

it is still important that further incremental major actions be shaped so as to minimize adverse environmental consequences. It is also important in future action that account be taken of environmental consequences not fully evaluated at the outset of the project or program."

Such an administrative interpretation can not be ignored except for the strongest reasons, particularly where, as here, such an interpretation involves a construction of a statute by the men charged with the responsibility of putting that statute into effect. See United States v. Leslie Salt Co., 350 U.S. 383, 396, 76 S.Ct. 416, 100 L.Ed. 441 (1956).

The proposed construction of the Gillham Dam is one of those "further major federal acts having a significant effect on the environment" contemplated by the language of the interim guidelines.

Recent decisions support the view that NEPA was intended to be applied in such circumstances as those before the Court. See, e. g., Sierra Club v. Laird, Civil No. 70-78 TUC, D.Ariz., June 23, 1970, where a preliminary injunction was entered with respect to certain contemplated work on a project that was already under way.

It is now necessary to review the history of the Gillham Dam project, and to describe briefly the Cossatot River, in order to understand fully the contentions of the parties.

The Gillham Dam is a part of a large public works project entitled "Millwood Reservoir and Alternate Reservoirs, Little River, Oklahoma and Arkansas." The proposed Gillham Dam is to be located at mile 49 on the Cossatot River about six miles northeast of the town of Gillham, Arkansas. As of September 1, 1970, it was estimated that the total cost of the Gillham Dam and Reservoir project would come to $14,800,000, of which $9,496,000 has been expended. Of the latter sum, $584,000 was spent for the acquisition of real estate. Although the over-all Millwood project, of which Gillham Dam is a part, was au-thorized by Congress in 1958, construction on the latter was not begun until 1963. In terms of the estimated total cost, approximately two thirds of the project has been completed. However, no work has yet been done on the dam itself, which is usually referred to by the defendants as the "embankment across the river." The dam is to be a simple earth and rockfill structure approximately 1,750 feet across and approximately 160 feet high. At full flood control pool it is estimated that the dam will impound about 222,000 acre-feet and inundate approximately 4,680 acres. The normal summer pool will cover 1,370 acres and have 36 miles of shoreline. It will not produce hydroelectric power. Water will not flow over it or through it but, rather, around it through the outlet works or over the spillway, which is a 240-foot-wide structure located in an adjacent saddle approximately 4,000 feet west of the dam and out of sight of the river. The outlet works consist principally of a 10-foot-diameter hole bored through a hill between the river and the spillway. The work on the spillway and the outlet works is complete or substantially complete.

At top of flood pool the reservoir created by the dam would inundate approximately 13.5 miles of the Cossatot River; at top of the conservation pool, sometimes referred to as the "normal pool," the reservoir would inundate 7.7 miles of the river; and at 10-year frequency drawdown, the reservoir would inundate 4.2 miles of the river.

If the other five tributary dams of the Millwood project are completed as planned, the Cossatot River would become the last major free-flowing stream in the Ouachita mountains of southeast Oklahoma and southwest Arkansas. In this event it would indeed be unique. The Cossatot River has remarkable esthetic, scenic and recreational qualities. The headwaters of the Cossatot are found in the Sugartree Mountains of the Ouachita National Forest near Mena, Arkansas. It is 87 miles in length and proceeds from its headwaters in a gen-

erally southward direction to its confluence with Little River some twenty miles southeast of DeQueen, Arkansas. The river has well-defined banks that are relatively stable. Only small amounts of sediment are normally transported downstream.

In its southward course, the Cossatot falls approximately 2,000 feet vertically. In the upper half of its course, it cuts across the east-west ridges of the Ouachita mountains and then descends rapidly through narrow canyons flowing over bedrock in a series of pools connected by rapids and small waterfalls. This area, which is primarily forest land, abounds with wildlife, including rabbits, squirrels, white-tailed deer, black bear and wild turkey. The river also supports a variety of fish life, including large-mouthed and smallmouthed bass, spotted bass, channel and flathead catfish, sunfish and crappie. No one questions the great natural beauty of the area. Slightly below the proposed dam site the river enters a transitional zone as it exits from the rocky highlands and enters the flat alluvial lands of the gulf coastal plan. Approximately 13 miles below the dam site at a point just above the Highway 70–71 bridge, the river starts to flatten out and to proceed thence to meander across flat bottom lands for approximately 33 miles before running into the Little River.

A great variation in the flow of the Cassatot has been observed at different times, with a record range from zero during lengthy droughts up to in excess of 45,000 cubic feet per second during excessively wet periods.

Fishermen, canoeists and others regularly float, and camp on the shores of the Cossatot, from the Highway 4 bridge to the Highway 70–71 bridge.

The plaintiffs contend, and the Court finds, that, because of the over-all Millwood project, as well as the presence of Lake Greeson, there is an abundance of flat-water recreational areas in the general vicinity of the proposed Gillham Dam reservoir. To continue the Cossatot

as a free-flowing stream would obviously retain some variety in the water and recreational resources of the area.

The Gillham Dam project will provide certain water supply benefits, particularly to the city of DeQueen.

Although no human life has apparently ever been lost by reason of a flood on the Cossatot River, there is strong evidence that floods on that river in the last few years have caused considerable livestock and property damage on the lower part of the river.

The attitude of the state government, and its agencies, toward this project is not too clear. Mr. Andrew Hulsey, the director of the Arkansas Game and Fish Commission, testified on behalf of the plaintiffs in a private capacity—that is, not as the spokesman for the Commission. In addition, Mr. Harold Alexander, an employee of the state Planning Commission, testified on behalf of the plaintiffs. Both favored leaving the Cossatot alone. The evidence of the defendants' consultation with state agencies leads the Court to conclude that in some cases such might have been rather superficial. And this also appears to be the case with respect to their consultation with certain federal agencies. Of course, the evidence at the hearing on the merits might clearly indicate to the contrary, but the present state of the evidence certainly leaves room for doubt.

The evidence presented by the defendants, particularly the testimony of certain employees of the Corps of Engineers, left the general impression with the Court that, if no work had been done on the Gillham Dam project, the defendants would be approaching the environmental impact study with a different, more open-minded, attitude. Indeed, this attitude is reflected in section 9 of the impact statement itself, which states:

"Any suggestion for restudy or abandonment of the Gillham project must consider the present project status. In view of the degree (2.2/1.0) of economic favorability mentioned above,

a complete restudy is almost certain to reaffirm the original decision to construct the project. In view of the advanced present status of construction and the absence of any new information that would upset the earlier decision, it is no longer practicable to reassess the basic course of action at this project."

The Court is not suggesting that the status of the work should not be considered in determining whether to proceed with the project. It is suggesting that the degree of the completion of the work should not inhibit the objective and thorough evaluation of the environmental impact of the project as required by NEPA. Although the attitude of the defendants is understandable, nevertheless, as the Court interprets NEPA, the Congress of the United States is intent upon requiring the agencies of the United States government, such as the defendants here, to objectively evaluate all of their projects, regardless of how much money has already been spent thereon and regardless of the degree of completion of the work.

Before analyzing the "Environmental Statement" (Plaintiffs' Exhibit 7), some general additional findings are in order.

The evidence introduced at the hearing on the application for temporary injunction strongly suggests that the construction of the Gillham Dam will not have a significant impact upon the flood control situation below Millwood, assuming the other five tributary dams are constructed as planned. Of course, it is clear from the evidence that the construction of the Gillham Dam will have a very important and significant flood-control effect on the lower reaches of the Cossatot itself (below the impoundment site). Furthermore, the evidence suggests that the construction of the Millwood Dam and the creation of that reservoir has had the effect of increasing the flooding potential on the lower reaches of the Cossatot. Apparently this is so because the Millwood Lake retards the speed of the run-off and therefore has a "back-up" effect. The Court further finds that the construction of the Gillham Dam will have the effect of protecting the livestock raised by landowners on property adjacent to the Cossatot, especially along the lower one-third of the river.

With respect to the environmental impact statement prepared by the defendants, and filed by them in early October (after the commencement of this suit), the plaintiffs stoutly contend that it is defective and deficient in many particulars and does not comply with the letter or the spirit of the NEPA. In general they contend that the statement reaches certain erroneous conclusions; gives inadequate attention to certain matters; and gives no attention at all to other extremely important environmental factors.

The impact statement concludes that the project will have the effect of enhancing the water quality of the Cossatot. The plaintiffs' evidence, which is persuasive, indicates that the quality of the water of the Cossatot in its natural state could hardly be improved upon. That evidence indicates also that the impoundment will result in temperature changes and oxygen content changes which would have a deleterious effect and which, indeed, might be contrary to the regulations promulgated by the Arkansas Water Pollution Control Commission.

The environmental impact statement suggests that the project will result in enhanced fish and wildlife benefits. A value judgment here depends upon the yardstick used, but plaintiffs have made a substantial showing that the impoundment will result in a downstream ecosystem that is less diverse and less stable than it would be if the Cossatot were maintained in its natural condition. More particularly, because of the temperature and oxygen content changes, the plaintiffs' evidence, through the testimony of both Dr. Emlen and Mr. Hulsey, strongly suggests that the Cossatot may well be essentially destroyed as a smallmouthed bass fishery, should the impoundment, as now designed, be con-

structed. The testimony also convinces the Court that the embankment, while it might not decrease the total volume of fish life, will reduce the quality and the variety of fish life in the Cossatot and will change the balance presently existing among the various species of such fish life. There is a good possibility that there will be an increase in the sluggish, lake-type fish in the impounded area and slightly upstream, vis-a-vis the current stream-type species. There is also good reason to believe that, because of the new and strange environment which will result from the impoundment, there may be a high incidence of abnormal and anomalous growth conditions in certain fish-life species, such as stunted growth and extra vertebrae. And the plaintiffs' testimony is to the effect that it will be a virtual certainty that there will be "dead" downstream areas. Further, plant species presently growing along the stream bank will be killed off in the impoundment area and along certain reaches of the stream. It is possible that the silver maple will suffer.

Another serious concern of the plaintiffs is that the whole area, being wild and generally inaccessible, has been very poorly and inadequately described, zoologically. Their concern, therefore, is not only for the damage which they feel will result to *known* animal life, but also to animal life that may not actually have been discovered and identified in and along the Cossatot. For instance, Dr. Emlen stated that a scientist by the name of Brimer, from Texas A. & M., had discovered two "brand new additions of species" of crawfish along the Cossatot that had never before been described. Dr. Emlen states that this implies that there may be other such rare and heretofore undescribed species in this area. He also refers to "relic species" as being of particular scientific interest. Their destruction would mean, of course, that scientists would never be able to trace their evolutionary ancestry. This may appear to be a matter of limited and esoteric concern, but we all know that many of mankind's most valuable scientific discoveries have come from just such interest and concern. And Dr. Emlen is also worried about the "horrendous" effects which could follow from the possible removal of a "keystone" species—if any there be—on the ecology of the Cossatot. He mentioned two examples of this phenomenon: the effect of removal of a certain species of starfish from the ecology of the coastline stretching from British Columbia to Central California, and also the better-known example of the removal of such a "keystone" species on the barrier reef of Australia.

A keystone species, according to Dr. Emlen, can be a most inconspicuous and innocuous form of life. It may consume little food and it may not directly compete with other forms of animal or plant life. And yet, its removal from the ecology can "trigger" a chain of events which can dramatically change the whole area. For instance, when the starfish is removed from the ecology of the coastline of northern California, the whole character of the coast and even the appearance of the beaches changes. Of course, in connection with the Cossatot, this is simply a matter of scientific speculation. But the plaintiffs' point is that such factors should at least be explored and considered in connection with any serious environmental or ecological study of the effects of the construction of such an embankment as the proposed Gillham Dam.

The plaintiffs point out that defendants, in their environmental impact statement, did not consider the problems and the possibilities discussed above with respect to fish and wildlife, and yet that statement indicates that the impoundment will result in enhanced fish and wildlife benefits.

The plaintiffs also emphasize that the environmental impact statement either gives inadequate attention to, or does not discuss at all, the following important environmental factors:

(a) the effect of changed fluctuations in downstream flow upon the biological

productivity and stability of the Cossatot;

(b) the effect of the migration of rough fish upstream from the impoundment and the effect of possible rough fish intrusions from the Millwood Reservoir into the lower reaches of the Cossatot;

(c) the identification of existing "food chains" in the area and a discussion of their importance and of the effect of the impoundment thereon;

(d) the effect of the impoundment on the frequency and quantity of alluvial deposits downstream;

(e) the probable effect of "drawdowns," particularly upon the impoundment shoreline vegetation, to determine what shoreline vegetation would be eliminated and to predict if mud flats or mud plants would be substituted therefor.

The plaintiffs also point out, and the evidence indicates, that the environmental impact statement filed by the defendants failed to really consider any substantially different alternatives to the project as presently conceived, in that it:

(a) did not adequately explore the possibility of offstream storage which might be accomplished through the device of tributary impoundments;

(b) did not simply explore the alternative of leaving the Cossatot alone (Note: A thorough evaluation of this alternative would require the assignment of values [for the benefit of the citizenry of the country in general] which might be preserved and protected by the decision to leave the stream alone);

(c) did not adequately describe the effect upon the over-all Millwood and Little River project of omitting the Gillham Dam (*i. e.,* what would be the effect upon the objectives of the over-all project if Millwood and the *other* five dams were constructed and the Cossatot left alone?);

(d) did not make any comparisons of the actual environmental impact of the Pine Creek Dam and the Broken Bow Dam, or perhaps even the dam on Lake Greeson, as a basis of predicting the impact of the construction of the Gillham Dam;

(e) did not project the possibility of population changes and the effect thereof upon the project; and, finally,

(f) did not consider the effect and cost of insurance as a method of protecting the owners of livestock (raised downstream from the proposed embankment) against the loss of such livestock due to flooding.

In other words, plaintiffs contend that the impact statement simply does not set forth a detailed study and examination of the important environmental factors involved. On the basis of the record and the evidence presented at the preliminary hearing, the Court is inclined to agree. It recognizes, of course, that much investigation and analysis may have been made and considered by the defendants even though not reflected in the impact statement or brought out by defendants' witnesses.

The factual findings referred to above are, as indicated, based upon the evidence introduced at the first hearing. Those findings, of course, could possibly be changed by other evidence which might be introduced at the hearing on the merits. Furthermore, because of the Court's view of its limited role under the law, as set forth in its third memorandum, none of such findings is in any way binding upon the defendants, or other appropriate administrative agencies, in the making of their own determinations with respect to such factual issues. Ultimately this Court could upset such administrative determinations only if they were not made in the manner required by law or if they were arbitrary and capricious under constitutional standards.

The Court wishes to emphasize that its findings are not in any way conclusive upon the factual issues referred to. Those findings, based upon the record and the evidence introduced at the preliminary hearing, are intended to indicate those areas wherein the defendants

may not have adequately complied with the provisions, policies and objectives of NEPA. They should assist counsel in determining the proof that they may wish to make at the hearing on the merits. In addition, they may assist the defendants in any further administrative studies, investigations, or hearings which they may voluntarily undertake to determine, and record, the environmental impact of the Gillham Dam and reservoir project. Indeed, the defendants may already have made studies, investigations and analyses which would answer the Court's doubts as to their compliance with NEPA. On the other hand, they may wish to undertake, prior to the hearing on the merits, additional studies or hearings in order to demonstrate that they have taken into consideration all significant ecological and environmental data related to this project, as required by law.

The Court concludes that it has jurisdiction of the subject matter and of the parties; that the action arises under the National Environmental Policy Act of 1969, 42 U.S.C. § 4331 et seq., and possibly other federal statutes; that service of process upon the defendants has been effected in accordance with law; that venue is properly laid in this district and division as set forth in the Court's first memorandum; that certain of the plaintiffs have standing to maintain this suit, as more particularly set forth in the Court's second memorandum; that, if the defendants proceed with the Gillham Dam project without complying with the provisions of NEPA, they will be acting in excess of their statutory authority and, therefore, this suit is not barred by the doctrine of sovereign immunity; that the pleadings and the evidence introduced at the preliminary hearing on November 24 and 25, 1970, raise substantial questions of possible violations by the defendants of the National Environmental Policy Act and possibly of certain other federal acts; that the questions raised by the plaintiffs are grave and substantial; that the plaintiffs have no adequate remedy at law and would be irreparably injured were the defendants to proceed with the construction of the Gillham Dam prior to a hearing upon the merits; that plaintiffs have a sufficiently great chance of prevailing upon the merits to justify the entry of a preliminary injunction should the defendants propose to take further substantive action with respect to the construction of the Gillham Dam prior to the hearing on the merits; and that, however, there being no present threat of such action by the defendants prior to the hearing upon the merits, the plaintiffs' application for a preliminary injunction should be denied, without prejudice to their right to further apply for such relief should a change in the status quo be threatened prior to the hearing on the merits.

This memorandum and the Court's third memorandum of December 22, 1970, shall constitute the findings of fact and conclusions of law upon the plaintiffs' application for temporary injunctive relief.