**Earle MONTGOMERY, Plaintiff,**

v.

**John R. ELLIS et al., Defendants.**

**Civ. A. No. 71–644.**

United States District Court,
N. D. Alabama, E. D.

Sept. 11, 1973.

Earle Montgomery, pro se.

Robert R. Reid, Jr., and Allen Poppleton, Bradley, Arant, Rose & White, Birmingham, Ala., for plaintiff.

Wayman G. Sherrer, U. S. Atty., William D. Mallard, Jr., Charles Stewart, Asst. U. S. Attys., Birmingham, Ala., for W. B. Lingle and C. W. Friday.

George F. Wooten, Dixon, Wooten, Boyett & McCrary, Talladega, Ala., for John R. Ellis, and C. B. Munroe.

## FINAL ORDER OF SUMMARY JUDGMENT

GUIN, District Judge.

This action is brought to enjoin implementation or construction of a stream channelization project of the Soil Conservation Service of the U. S. Department of Agriculture ("SCS") on Blue-Eye Creek, a tributary of the Coosa River, in Talladega County, Alabama. The case is before the Court upon reconsideration of the cross motions for summary judgment filed by plaintiff and by the defendant SCS officials. Plaintiff has alleged that the SCS has failed to file an adequate "detailed statement" as required under the National Environmental Policy Act of 1969 (42 U.S.C.A. § 4321 et seq.) ("NEPA"), that the SCS has been arbitrary in the environmental impact statement it did file ("the EIS") in failing adequately to consider or describe all reasonable available alternatives to the project and in employing an unrealistic interest rate and project life in computing benefits and costs of the project, and finally that the SCS officials have failed to follow the pertinent applicable regulations of the Department of Agriculture. In response, the SCS claimed that it did not have to file an environmental impact statement and, even if it did, the one that it did file was sufficient and that its departmental regulations had been complied with.[1]

The Court has heard argument on these points in chambers with attorneys for all parties present and has reviewed the briefs filed by plaintiff and the defendant SCS officials on the need for and adequacy of the environmental impact statement for this project. It is the Court's opinion that an environmental impact statement is required for the project in question; that the one filed by the SCS is inadequate both in failure adequately to set forth the available alternatives and other matters required by NEPA and in failure to employ a realistic interest rate and project life in computing the benefits and costs of this project; and that the SCS has failed to comply with applicable law in the other respects set forth below. Accordingly, an injunction will issue in the form specifically set forth at the end of this opinion, against any construction, installation, or further authorization or financing of the stream channelization of Blue-Eye Creek pursuant to the Blue-Eye Creek Watershed Project. Discus-

[1] At the outset of the case, the defendant SCS officials claimed that the suit was barred under the doctrine of sovereign immunity, but that claim was rejected by overruling their motion that the United States be substituted for the named SCS defendants. Clearly a suit alleging that federal officials are acting ultra vires or beyond their lawful authority is not barred by sovereign immunity. Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); Philadelphia Co. v. Stimson, 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570 (1912); Environmental Defense Fund v. Corps of Engineers (Gillham Dam), 325 F.Supp. 728 (E.D.Ark. 1970); Environmental Defense Fund v. Corps of Engineers (Cross-Florida Barge Canal), 324 F.Supp. 878 (D.D.C.1971).

sion of the issues before the Court is as follows:

I. *Need for Environmental Impact Statement.*

The measures proposed to be installed on Blue-Eye Creek pursuant to the work plan prepared by SCS for the Blue-Eye Creek Watershed Project consist of two water retention structures, completed in 1968 and 1969, respectively, and a stream channelization project of the creek below the two dams that has not yet been installed. Since the water retention structures have been completed, have been in operation for several years and, according to the EIS and a report of the SCS (excerpts from which have been set forth in one of the affidavits filed in behalf of plaintiff), have been operating properly, it appears to the Court that the stream channelization, not yet installed, is a separate project or, at the very least, is a major part of an on-going project.

 Accordingly, pursuant to the great weight of authority under NEPA, the Court finds that an environmental impact statement is required and that authorization prior to the effective date of NEPA on January 1, 1970, is no defense. Environmental Defense Fund v. TVA, 468 F.2d 1164 (6th Cir. 1972) (Tellico Project on Little Tennessee River, authorized in 1966 with construction of concrete portion of dam completed in 1969); Fayetteville Area Chamber of Commerce v. Volpe, 463 F.2d 402 (4th Cir. 1972) (location hearing for by-pass held in 1966 and by-pass approved in 1968); Brooks v. Volpe, 460 F.2d 1193 (9th Cir. 1972) (highway project where determination of location made in 1967); Calvert Cliffs' Coordinating Committee v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109 (D.C.Cir.1971) (applying NEPA to nuclear power plants under construction notwithstanding construction permits might have been issued prior to the effective date of that act— see Part V of the decision at 449 F.2d 1127–1129; Natural Resources Defense Council v. Grant, 341 F.Supp. 356 (E.D.

N.C.1972) (stream channelization project of SCS initially authorized in 1966); Environmental Defense Fund v. Corps of Engineers, 325 F.Supp. 728, 749 (E. D.Ark.1970–71) (Gillham Dam Project in Arkansas, authorized in 1958, begun in 1963 and approximately 60% completed); Environmental Defense Fund v. Corps of Engineers, 324 F.Supp. 878 (D.D.C.1971) (Cross-Florida Barge Canal, authorized in 1942, begun in 1964, with canal ⅓ completed and entire project ⅙ completed); and Sierra Club v. Laird (C.A.No. 70–78, D.Ariz. 1970) (Gila River channelization that had been approved prior to passage of NEPA). It should be noted that in many of the above cases, construction had been begun prior to the effective date of NEPA.

Indicative of the same result in this circuit is Zabel v. Tabb, 430 F.2d 199 (5th Cir. 1970), which applied NEPA, with other authorities, to uphold the denial in 1967 by the Corps of Engineers of a permit for dredging in Boca Ciega Bay near St. Petersburg, Florida, stating,

> "This Act (NEPA) essentially states that every federal agency shall consider ecological factors when dealing with activities which may have an impact on man's environment.

> "Although this Congressional command was not in existence at the time the permit in question was denied, the correctness of that decision must be determined by the applicable standards of today." 430 F.2d at 211–213.

Accord: Bankers Life & Casualty Co. v. Village of North Palm Beach, 469 F.2d 994 (5th Cir. 1972).

It, thus, seems clear to the Court that an environmental impact statement is required for this channelization project; and this much may, in effect, have been recognized by SCS since it prepared the environmental impact statement approved on August 30, 1971, by Mr. William B. Lingle, SCS State Conservationist for Alabama, who is one of the defendants in this case.

II. *Failure to File Adequate "Detailed Statement" Under NEPA.*

Section 102(2)(C) of NEPA requires, among other subjects to be covered, *"a detailed statement* by the responsible official on the environmental impact of the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented,"* and *"alternatives to the proposed action."* (Emphasis supplied.) "Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public . . ." As stated in the leading case of *Calvert Cliffs', supra,* 449 F.2d at 1114,

> " . . . By compelling a formal 'detailed statement' and a description of alternatives, NEPA provides evidence that the mandated decision making process had in fact taken place and, most importantly, allows those removed from the initial process to evaluate and balance the factors on their own".

The court in *Gillham Dam* stressed this requirement, stating, *"at the very least, NEPA is an environmental full disclosure law."* (Emphasis supplied.) 325 F.Supp. at 759.

█ Notwithstanding the fact as stated that the SCS filed an environmental impact statement covering the Blue-Eye Creek Project, the Court finds that the EIS, which is attached to both motions for summary judgment, is on its face insufficient in a number of material respects:

(1) *Failure to set forth physical characteristics of project.* Perhaps the most obvious deficiency in the EIS is failure adequately to describe the proposed channel project. All that is set forth is that a certain number of miles of stream will be channelized, and plaintiff states all that he really knows is that the easement sought to be condemned across his land is to be 150 feet from the center-line of the creek. It would seem elemental for an environmental impact statement to describe adequately the project in question so that those removed from the initial decisionmaking process may be able to appraise what type of project is being considered. The Court feels that, at the very least, the EIS should set forth the width and depth proposed for the stream channel—such as at its source and mouth—and its general direction so that the property owners whose lands are being affected, as well as governmental officials removed from the decisionmaking process, can have some idea of what the SCS is proposing and whether or not the channel is to follow the natural stream bed. Without such basic information, the EIS must be deemed insufficient on its face.

█ (2) *Failure to set forth benefit and cost factors.* As to the matter of benefits and costs from the project, the EIS merely sets forth (on page 2),

> "Average annual benefits accruing from the project *are estimated to be $21,650.* Average annual costs which were updated to a 1971 price base *are estimated to be $20,584.* The cost is based on a *100-year evaluation period* with a $3\frac{1}{8}\%$ interest rate for measures installed and a *$3\frac{1}{4}\%$ interest rate* for measures to be installed. . . . It is further estimated that *for each dollar of cost approximately $1.05 in benefits* will be realized." (Emphasis supplied.)

It is readily apparent from the above minimal information that persons removed from making the initial decision, such as the President, the Council on Environmental Quality ("CEQ") and the public, can have no way of ascertaining, as contemplated by NEPA, the justification for or desirability of this project, since what costs are allocated to what items and what amounts of benefits are claimed from others are not in the EIS. The information may be somewhere in the files of the SCS, but this cannot satisfy the requirement of NEPA that it be made available to public officials removed from the initial decisionmaking

process and to the public in general. As stated in *Calvert Cliffs', supra,* the "detailed statement" is to cover "the environmental costs which might be avoided", 449 F.2d at 1114, and,

> "In each individual case, the particular *economic and technical benefits* of planned action *must be assessed and then weighed against the environmental costs;* alternatives must be considered which will affect the balance of values . . . In some cases, the benefits will be great enough to justify a certain quantum of environmental costs; in other cases, they will not be so great and the proposed action may have to be abandoned or significantly altered so as to bring the benefits and costs into a proper balance. The point of the individualized *balancing analysis is to ensure* that, with possible alterations, *the optimally beneficial action is finally taken."* (Emphasis supplied.) 449 F.2d at 1123.

In further reference to the use of conclusory figures, the following from Environmental Defense Fund v. TVA, 339 F.Supp. 806 at 809 (E.D.Tenn.1972), aff'd, 468 F.2d 1164 (6th Cir. 1972), is particularly pertinent:

> "Although comprehensive in scope, the draft *statement's cost-benefit analysis consists almost entirely of unsupported conclusions. As a result, a non-expert reader is denied the opportunity to intelligently evaluate TVA's conclusions.* In addition, it is impossible to determine the thoroughness of the research upon which TVA based the conclusions, *or their relative merit."* (Emphasis supplied.)

To the same effect as to the necessity of explaining cost computations, at least in some detail, is Daly v. Volpe, 350 F. Supp. 252 (W.D.Wash.1972), where the court found inadequate an environmental impact statement for a highway project, some of the grounds being failure to detail the cost of land, construction materials and labor as well as listing all adverse environmental effects. The court

stated that the subjects discussed were "conclusory rather than analytical".

Attached to plaintiff's motion for summary judgment is an affidavit of Dr. Paul E. Roberts, Jr., an economist with much experience in evaluating costs and benefits of such projects, which shows that the erroneous inclusion of virtually any benefits or the failure to include any cost items would reduce the benefit-cost ratio below unity. This would show the project to be unauthorized under P.L. 566 (16 U.S.C.A. § 1001 et seq.), the statute under which it is claimed to be authorized and which requires, in 16 U.S.C.A. § 1005, that benefits exceed costs.

Those entitled to receive information about a project under the mandate of NEPA are entitled to know the facts on which the decision to proceed was based, such as which items were included and which were not and what evaluations were given them. It is obvious, however, that those facts are not adequately covered by the minimal information from the EIS quoted above. Such is not the full disclosure required by NEPA and the above decisions. Consequently, the EIS must be regarded as deficient on its face in this respect.

(3) *Failure to separate benefits and costs of stream channelization from those of water retention structures.* Two water retention structures have already been built in the Blue-Eye Creek Watershed; and since they were completed prior to the effective date of NEPA, no environmental impact statement was or is required for them. However, the stream channel project has not been installed and, under the numerous decisions referred to in Part I of this opinion, an environmental impact statement is required for it. It seems obvious, however, that in making the decision whether or not to install this stream channelization, the SCS, as well as those removed from the decisionmaking process, should be given the opportunity to appraise the benefits and costs accruing from the channelization as opposed to having them lumped in with the

water retention structures, which is now the case in the EIS. For example, those structures could have some very beneficial effects, such as a decrease in downstream sedimentation and creation of some recreational benefits. On the other hand, by its very nature, a channelization project will increase sedimentation downstream and will destroy stream recreational benefits, thereby having adverse effects on the environment.[2]

The two water retention structures have been in place since 1968 and 1969, respectively; and the language of the EIS and documents submitted in this case (such as the excerpt from the SCS's 1971 report) show that, even in times of heavy rainfall, flooding is reduced and the structures are functioning properly, all without the channelization of Blue-Eye Creek. Furthermore, the SCS's own figures separate the two projects. It has applied different interest rates to them ($3\frac{1}{8}\%$ to the water retention structures, and $3\frac{1}{4}\%$ to the stream channelization (see page 2 of the EIS)). The water retention structures were completed prior to acquiring the easements for the stream channelization, thereby showing that SCS was willing to construct the dams without necessarily obtaining the land rights for the stream channelization.[3]

It is admitted in the EIS that the channelization project will only reduce the estimated projected flooding by 77%, whereas it has already been reduced with the flood-water retention structures in place. Thus, with employment of alternatives—such as those set forth below—in lieu of channelization, it may very well be that the water retention structures will give as great a degree of protection without the environ-mental damages from channelization of a natural stream. However, no one will ever be able to determine this without such a breakdown of benefits and costs. An environmental impact statement is designed to require the agency involved, and to permit others intelligently, to appraise such factors and the desirability of alternatives; thus, the EIS is deficient on its face for failure to separate the benefits and costs attributable to the water retention structures and the stream channelization.

(4) *Failure adequately to consider or describe available alternatives to project.* NEPA requires under Section 102(2)(C) "a detailed statement by the responsible official on . . . (iii) alternatives to the proposed action", and Section 102(2)(D) requires all agencies of the Federal Government to:

> "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources . . ."

Certain alternatives not discussed in the EIS may be readily apparent; but, for some guidelines as to what alternatives should be considered and discussed, we may look to the recent decision of the Eighth Circuit in Environmental Defense Fund v. Froehlke, 473 F.2d 346 (8th Cir. 1972), involving channelization of the Cache River by the Corps of Engineers. Among the alternatives required to be discussed in detail, for which insufficiency the impact statement was ruled inadequate, were "flood plain zoning", "crop insurance" and "plans consisting of various combinations of diversions, floodways, reservoirs, interceptor ditches and levees".

2. The EIS shows this situation on its face where reduced sedimentation downstream is claimed as one of the benefits to accrue from the project (page 6), but it is stated (at page 12), "The planned reduction in sedimentation will result from both land treatment and the trapping of sediment in the sediment pools above the two floodwater retarding structures." Consequently, this claimed benefit will accrue from the water retention structures and land treatment measures, not from the channelization project.

3. See the schedule of acquisition of easements attached to the affidavit of Mr. Merrill I. Tisher of the SCS, dated July 17, 1972, and filed in this cause.

While one of such alternatives, i. e. levees, is discussed in the EIS on Blue-Eye Creek, virtually nothing is said of the others. In addition, while the Eighth Circuit observed that some of such alternatives were mentioned in the impact statement, it held that none were discussed in sufficient detail to comply with NEPA and the guidelines of the CEQ promulgated thereunder, which state:

> "A rigorous explanation and objective evaluation of *alternative actions that might avoid some or all of the adverse environmental effects is essential.* Sufficient analysis of such alternatives and *their costs and impact on the environment* should accompany the proposed action through the agency review process in order not to foreclose prematurely options which might have less detrimental effects." (Emphasis supplied.) CEQ Guidelines, Para. 6(a)(iii), 36 Fed.Reg. 7724, April 23, 1971.

The court continued:

> "To fulfill these mandates, the impact study should not just list the alternatives to the proposed project but it should also include the results of the Corps' own investigation and evaluation of alternatives so that the reasons for the choice of a course of action are clear. . . . The complete impact study must contain more than a catalog of environmental facts, however. The agency must also 'explicate fully its course of inquiry, its analysis and its reasoning.' Ely v. Velde, 451 F.2d 1130, 1139 (4th Cir. 1971)." 473 F.2d at 350–351.

Further guidelines are set forth in *Gillham Dam, supra,* where it is stated,

> "Section 102(2)(C)(iii) requires the impact statement to discuss the alternatives to the proposed action. *The most glaring deficiency in this respect is the failure to set forth and fully describe the alternative of leaving* the Cossatot (the river involved in that case) *alone. Furthermore, the statement does not adequately consid-

er nonstructural alternatives for flood control, such as* flood plain management (although defendants refer to it in the impact statement), *private or publicly subsidized insurance, . . .* " (Emphasis supplied.) 325 F.Supp. at 761.

To the same effect is *Calvert Cliffs', supra,* stating,

> "This requirement (Section 102(2) (D)), like the 'detailed statement' requirement, seeks to ensure that each agency decision maker has before him and takes into proper account *all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and cost-benefit balance.* Only in that fashion is it likely that the most intelligent, optimally beneficial decision will ultimately be made." (Emphasis supplied.) 449 F.2d at 1114. Further, "NEPA requires that an agency must—to the *fullest* extent possible under its other statutory obligations—consider alternatives to its actions which would reduce environmental damage. That principle establishes that consideration of environmental matters must be more than a *pro forma* ritual. Clearly, it is pointless to 'consider' environmental costs without also seriously considering action to avoid them . . . " (Emphasis by the court.) 449 F.2d at 1128.

The EIS for Blue-Eye Creek shows on its face that it is inadequate in discussing at least the following alternatives:

(a) *Elimination of channelization.* While the EIS refers to loss of some claimed benefits if the channelization of Blue-Eye Creek were not installed, that comment is described only as an estimate and no background details are given. On the other hand, SCS has apparently not considered the combined benefits—or at least the EIS does not discuss this alternative—from the water retention structures already constructed and from leaving the rest of Blue-Eye Creek alone so as to avoid the adverse

effects of the channelization, some of which are listed in the EIS (on page 7).[4]

Under the above decisions, not carrying out a project is always an alternative to be considered in an impact statement; and this should especially be true here where, as set forth in the EIS, the channelization of the entire creek will only reduce flood damages an estimated 77%.

(b) *Water retarding structures or other methods of controlling run-off on tributary creeks.* A map of the area, filed as an exhibit by the SCS defendants (see footnote 3, *supra*), shows that there are tributaries to Blue-Eye Creek that would contribute to any flooding problem and one of which the SCS proposes to channelize by a lateral channel.[5] In addition, the map referred to shows there are at least five water retention structures on small tributary streams but none yet on two of the three major tributaries. However, the EIS fails to discuss the alternative of water retention structures, land treatment measures or other methods of controlling water run-off in those tributaries as an alternative to channelization and the accompanying environmental damage to the watershed of Blue-Eye Creek. These facts of record show that this is an alternative that should and could have been explored and may well be the solution to the entire problem. Such an alternative is one of those required to be considered under *Cache River, supra;* however, it is not appraised or even discussed in the EIS.[6]

(c) *Diversion channels or by-passes at the Town of Lincoln.* Plaintiff has also suggested diversion channels or by-passes at the Town of Lincoln, since, as shown by the SCS map referred to above, Blue-Eye Creek takes a sharp turn in that area, and since the SCS claims flooding as a problem in Lincoln; this, by its own claims of benefits of the project, would be a viable alternative that should be explored, since such diversion channels would eliminate certain occasional flood conditions that are claimed as benefits for this project, without the environmental damage and additional expense of channelizing the entire creek. It also is an alternative referred to in *Cache River, supra.*

---

4. The EIS refers (on page 6) to flooding in a portion of the Town of Lincoln in Talladega County as a justification for the project. However, not channelizing Blue-Eye Creek upstream would naturally help any flooding problem in the town since run-off of water above the town would be held back. The EIS shows this on its face where (at page 14) it is stated, "Channel improvement in town (Lincoln) is necessary to provide an outlet for channel improvement upstream."

5. An affidavit of plaintiff further substantiates that tributaries contribute to "any flooding problems that may exist in that town (Lincoln)".

6. At several points in the EIS, SCS has referred to the elimination of flooding of some nine dwellings in the Town of Lincoln (said by plaintiff to be only seven as located by visual observation) as a beneficial effect of this project. It appears that these dwellings are located on a tributary of the creek that SCS plans for a lateral channel and· on which plaintiff has urged, as an alternative, a water retention structure. Consequently, such an alternative would appear particularly appropriate for consideration as to that tributary. The Court is also impressed with the fact that, if as plaintiff asserts and as was adverted to in oral argument, these dwellings are occupied by low-income persons, an alternative that would alleviate their flooding would be relocation to nearby higher ground under other programs of the Federal Government. This, as plaintiff has pointed out, would give 100% flood protection by the relocation of only the nine (or seven) dwellings or the persons living in them, whereas the project is designed only to give 77% protection. As is amply demonstrated by Natural Resources Defense Council v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972), cited by both plaintiff and defendants, the responsible agency, in preparing an environmental impact statement, must not confine itself to alternatives within its own field of operation but must consider those that can be carried out by other branches of the government. In this instance, the alternative suggested by plaintiff would appear to be a most suitable one for eliminating undesirable living conditions of low-income persons in a manner consistent with other established governmental policies.

(d) *Flood insurance.* The necessity to consider this alternative is specifically mentioned in both *Cache River* and *Gillham Dam, supra.* It is noteworthy that a complete solution to the alleged flooding problem is not offered by the Blue-Eye Creek Project; in fact, it is not contended that it would eliminate more than 77% of the alleged flooding even if none of the above alternatives were employed and even if the channelization project were carried out. Thus, it is obviously not a solution to the entire problem. Consequently, flood insurance to cover those floods that might occur in the future is clearly an alternative that should be considered.

It is also noteworthy that if the construction costs of the channelization (almost $200,000) were invested at 5% the annual interest would provide flood damage payments each year (if any damaging floods do occur) of around 90% of the benefits said by the SCS to accrue from the channelization and without all the maintenance and other costs and adverse environmental effects of channelization. Consequently, when such costs and adverse effects are considered, insurance may well provide greater net benefits than channelization, thereby showing on the face of the EIS that public or private flood insurance is clearly a viable alternative that should be considered.

The SCS has extensively cited Natural Resources Defense Council v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972), involving proposed oil and gas lease-sales of tracts on the outer continental shelf, as indicating a limitation on alternatives that the agency need consider. However, that case required, as alternative proposals that might assist in abatement of the energy crisis, discussion of such matters as elimination of oil import quotas, which would require consideraton of the national economy, foreign relations and national security. The court held that the alternatives required for discussion should not be limited to measures the responsible agency or official, in that case the Secretary of the Interior, could adopt, stating:

> "As to alternatives not within the scope of authority of the responsible official, reference may, of course, be made to studies of other agencies—including other impact statements. *Nor is it appropriate* as the Government counsel argues, to *disregard alternatives merely because they do not offer a complete solution to the problem.* If an alternative would result in supplying only part of the energy that the lease sale would yield, then its use might possibly reduce the scope of the lease sale program and thus alleviate a significant portion of the environmental harm attendant on offshore drilling." (Emphasis supplied.) 458 F.2d at 836.

That case is, thus, requiring the discussion of alternatives more removed from the agency's authority than those suggested in the instant case and, hence, does not support an absence of discussion in the EIS of the alternatives set forth above. Further, it dictates that those alternatives be considered even if they are only partial solutions. In fact, it appears established by the above authorities that each such alternative must be adequately discussed, since it is either (1) expressly required to be considered by court decisions, (2) clearly within the scope of authority of the SCS (e. g. other water retention structures or diversion channels), or (3) easily identified by the SCS since already mentioned on the face of the EIS (e.g. relocation of the houses of low-income persons where one of the lateral channels is proposed to be located).

(5) *Erroneous inclusion of recreational benefits.* Recreational benefits from lakes behind the dams have apparently been included in the benefits justifying this project as they appear listed as a favorable environmental effect in the EIS (page 7). Plaintiff, however, has pointed out in his affidavit that the impoundments are not open to the general public and, consequently, since those benefits are not available, they should

not be considered "because the lakes are on private property from which the general public has been barred." In response, the SCS has attempted to defend its position by claiming that "recreational use *will be* made of the 25 surface acres of water. The evaluation of these incidental recreational benefits was in keeping with Soil Conservation Service procedures." The court notes, however, that this affidavit by Mr. Ernest V. Todd, Assistant State Conservationist for SCS in Alabama, does not directly controvert that of plaintiff. It does not state that recreational use is available to the public but only that it "will be" made.

▮ In addition, apparently feeling that the public might not be permitted to use the areas, SCS has in its brief advanced the position (which, however, is not set forth in the EIS) that use by the landowner or his neighbors or friends, even though the lakes might not be available to the general public, should be counted as a benefit. No authority is cited for that proposition, and the Court knows of none. On the other hand, the Court feels that logic dictates that if an impoundment constructed with public funds is not available to the general public, recreational benefits should not be claimed. In the interest of flood control it may be very desirable to construct the impoundment; but if it is not available for public recreation, the recreational benefits should not be claimed. Further, regardless of disposition of this issue, it should be covered in the EIS so that those removed from the initial decisionmaking process will know the true circumstances of the claimed recreational benefits and will not be misled into thinking a public recreational lake has been created.

▮ While this deficiency in the EIS is of necessity based on certain facts, the present facts set forth by plaintiff have not been countered by the SCS and, in fact, SCS has apparently admitted they are true and is advancing some justification for nevertheless including

them as recreational benefits from the project. The Court feels that if the SCS has any facts that would support inclusion of recreational benefits, it should have set them forth in its affidavit, and that in the interest of expediting the decision of cases and avoiding the trial of issues as to which there is no genuine dispute as to material facts, one party cannot withhold his evidence until trial but must show, on a motion for summary judgment, that there is a reasonable dispute of facts. Surkin v. Charteris, 197 F.2d 77 (5th Cir. 1952), holding, on the granting of a motion for summary judgment, that "the opposing party must sufficiently disclose what the evidence will be to show that there is a genuine issue of fact to be tried."

(6) *In General.* In its brief, the SCS has cited certain statements by courts that not every detail must be set forth in impact statements. However, the Court feels that the above omissions are no mere details but, instead, are significant factors that need to be brought to the attention of those removed from the decisionmaking process as required by the express provisions of NEPA.

While the Court certainly agrees that length is no guarantee of an adequate "detailed statement" as required by NEPA, it is noted that in *Gillham Dam, supra*, one of the cases principally relied on by SCS, the initial environmental impact statement was held inadequate in Environmental Defense Fund v. Corps of Engineers, 325 F.Supp. 728, 749 (E.D.Ark.1970–71). When a new impact statement was prepared and was held sufficient in 342 F.Supp. 1211 (E.D. Ark.1972), it is noted that it was prepared after two hearings, the adverse comments in which were included in the new statement, and that it consisted of 200 pages with six appendices (aggregating about 1500 pages). The district court even then said that it was not "as fair and impartial and objective as if it had been compiled by a disinterested third person", but felt that all necessary factors could be found somewhere within its bounds. Such a presentation is in

considerable contrast to the existing statement on Blue-Eye Creek, which consists actually of only nine pages plus five pages under "consultation" summarizing certain comments by other agencies.

This last factor also indicates clearly that the EIS in this case is merely a re-working of some basic data compiled long ago; and, in fact, this seems to be admitted in the SCS's brief. It is also indicated by the fact, discussed in Part IV of this opinion, that the SCS officials have not re-evaluated the project as required by SCS regulations.

Further, it appears from the disposition in the EIS of comments of others that the SCS, having formed its decision to proceed with the project, did not of its own initiative consider any alternatives but has merely disposed of all those suggested by others. It has, thus, relegated the required investigatory process under NEPA to mere paperwork in justification of a project it apparently had already decided to carry out. This is in direct contravention of the requirements of NEPA as expressed in numerous cases. To mention only one, in Brooks v. Volpe, 350 F.Supp. 269 (W.D.Wash.1972), where an impact statement of 43 pages on a highway project was held inadequate, the court criticized the statement as follows:

"For the most part, the impact statement suffers from a serious lack of detail, and relies on conclusions and assumptions without reference to supporting objective data. Federal reviewers could not have made an independent decision based on the information referred to, because the sources are not disclosed. The impact statement also suffers from a reliance on generalities and heavy-handed self-justifications." 350 F.Supp. at 277–278.

The court concluded that NEPA requires each agency to undertake the research needed adequately to expose environmental harms and, hence, to appraise available alternatives. It appears from the face of the EIS in this case that such procedure has not been employed as to Blue-Eye Creek. As stated in a similar case involving another Washington highway project, Daly v. Volpe, *supra,*

"The environmental impact statement was intended by Congress *to provide* decision-making bodies with *sufficient information to make an environmentally sound decision, not to offer evidence of the wisdom of that decision once it has been made,*" citing *Calvert Cliffs', supra.* (Emphasis supplied.) 350 F.Supp. at 259.

The Court understands plaintiff contends that a stream channelization project such as this will have the adverse effects of increased downstream flooding, increased erosion and, as a result, increased downstream sedimentation, and perhaps lowering of the water level that would result in draining the springs on his property and impairing the water resources for his pastures. On the other hand, the position of SCS as indicated in the EIS and in its brief is that such effects should be insignificant and, as to erosion and downstream siltation, are expected to be limited in duration. The Court, however, in rendering its judgment is not basing its decision on any such matters that may, at this juncture, be considered disputed matters of fact. Instead, it is passing only upon those insufficiencies that appear on the face of the EIS or as to which there appear to be no genuine issue of material fact to be resolved. Under such circumstances, summary judgment under Rule 56 is the appropriate remedy, and the Court is disposed to follow the recent decision of the Fifth Circuit in DeBardeleben v. Cummings; 453 F.2d 320 (5th Cir. 1972), to the effect that, although there may be arguments between the parties, if there is no dispute over the facts involved, there is no impediment to the entry of summary judgment. To hold otherwise would result in the uneconomic expenditure of time and effort both by the parties and the courts in trying factual issues that might be involved in determining the ad-

equacy of an environmental impact statement when that statement, as a matter of law and undisputed fact, is already insufficient on its face.

III. *Arbitrary Failure to Employ Realistic Interest Rate and Project Life in Computing Benefits and Costs.*

At page 2 of the EIS, it is stated,

"The cost is based on a *100-year evaluation period* with a 3⅛% interest rate for measures installed and a *3¼% interest rate* for measures to be installed. . . . It is further *estimated that for each dollar of cost approximately $1.05 in benefits will* be realized." (Emphasis supplied.)

The testimony of Dr. Paul E. Roberts, Jr., an economist with experience in appraising such projects as this, when given in *Gillham Dam, supra,* at 325 F.Supp. 761, is that the rate employed in water resource projects in 1970 was 5¼% and, in his affidavit submitted in this case, he states that the current rate in 1971 was 5⅛%. The Court feels that it is entitled to take judicial notice of the "unquestionable fact", IX Wigmore on Evidence, Sec. 2580, that the current interest rate is much higher than the 3¼% used by SCS in computing costs for this project. The affidavit of Dr. Roberts referred to above shows that even a slight increase in that interest rate—and the same would occur from a shortening of project life—would reduce the benefit-cost ratio below unity, and for that reason, would cause the project to fail to meet the requirements of P.L. 566 under which it is claimed to be authorized since that statute requires that benefits exceed costs. Further, the extract from Dr. Roberts' testimony in *Gillham Dam, supra,* shows that historically a 100-year project life may have been used in the past, but presently the standard is 50 years for such projects. It is, thus, the opinion of the Court that the SCS, in employing a project life that is no longer current and an interest rate that is extremely low by modern standards, has failed to give effect to the requirements

of Section 101 of NEPA that all agencies of the Federal Government shall exercise a continuing policy and continuing responsibility under NEPA regarding projects that might affect the environment.

Defendants claim, however, that the courts cannot review a benefit-cost determination and, thus, attempt to insulate the use of a computation based on such historic figures from judicial review. In this aspect of the case, however, the Court feels that the function of the judicial branch is otherwise and that this is established by sound appellate decisions to the effect that the courts have the right—and indeed the responsibility—to review any arbitrary or capricious administrative agency determination or, under NEPA, one that gives insufficient consideration to environmental values.

As applied to the instant case, the SCS cannot strike an arbitrary balance of benefits and costs by use of such an unrealistic interest rate and project life, and, further, it must assign appropriate values to the environmental losses, some of which have been noted in the EIS, that will occur as a result of the project. Only in this way may the true costs of the project be balanced against the net benefits claimed from it, as is required by NEPA and the decisions interpreting it.

In *Calvert Cliffs', supra,* the District of Columbia Court of Appeals referred to the reviewing court's right to reverse a substantive agency decision on its merits if "it be shown that the actual *balance of costs and benefits that was struck was arbitrary* or *clearly gave insufficient weight to environmental values.*" (Emphasis supplied.) 449 F.2d at 1115.

In addition, under statutory language similar to that in Title 16, Sec. 1005, U.S.C.A., which requires as a condition for undertaking a watershed project that "the Secretary (of Agriculture) has determined that the benefits exceed the costs . . .", decisions of the U.S. Supreme Court and courts of appeal have supported review of the agency de-

termination. Recently, in Citizens to Preserve Overton Park v. Volpe, 401 U. S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court held that only the rarest of agency actions is exempt from judicial review pursuant to the Administrative Procedure Act (5 U. S.C.A. § 701 et seq.) ("APA"), which provides that each person "adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof," with only two exceptions—where another statute precludes review, or where "agency action is committed to agency discretion by law."

In *Overton Park*, the Secretary of Transportation's approval of the route and design of a federal highway project was challenged. The applicable federal statutes prohibit the Secretary of Transportation from authorizing federal funds for highways through public parks if a "feasible and prudent" alternative route exists; and if no such alternative exists, the statutes allow construction through parks only if "all possible planning to minimize harm" to the park has taken place. 49 U.S.C.A. § 1653(f); 23 U.S. C.A. § 138. The plaintiffs sought judicial review of the Secretary's determination that those statutory standards had been satisfied; and the Supreme Court, reversing lower court decisions, held that judicial review of the Secretary's determination was mandated by APA and that "clear and convincing evidence" of a legislative intention to foreclose judicial review is necessary to limit such review:

> "Section 701 of the Administrative Procedure Act, 5 U.S.C. § 701 (1964 ed., Supp. V), provides that the action of 'each authority of the Government of the United States,' which includes the Department of Transportation, is subject to judicial review except where there is a statutory prohibition on review or where 'agency action is committed to agency discretion by law.' In this case, there is no indication that Congress sought to prohibit judicial review and there is most cer-

tainly no 'showing of "clear and convincing evidence" of a . . . legislative intent' to restrict access to judicial review." 401 U.S. at 410, 91 S. Ct. at 820.

The Court provided an equally narrow reading of the "agency discretion" exception to judicial review, holding:

> "Similarly, the Secretary's decision here does not fall within the exception for action 'committed to agency discretion.' This is a very narrow exception. Berger, Administrative Arbitrariness and Judicial Review, 65 Col. L.Rev. 55 (1965). The legislative history of the Administrative Procedure Act indicates that it is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' S.Rep.No.752, 79th Cong., 1st Sess., 26 (1945)." 401 U.S. at 410, 91 S.Ct. at 820.

To like effect is Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), sustaining summary judgment against enforcement of a regulation of the Commissioner of Food and Drugs and holding that judicial review will not be foreclosed "unless there is persuasive reason to believe" that Congress intended to bar the same. There the court quoted with approval the following language from the House Report that recommended passage of APA:

> "To preclude judicial review under this bill a statute, if not specific in withholding such review, must upon its face give clear and convincing evidence of an intent to withhold it. The mere failure to provide specially by statute for judicial review is certainly no evidence of intent to withhold review." H.R.Rep.No.1980, 79th Cong., 2d Sess., 41 (1946).

Further, in Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), a regulation of the Secretary of Agriculture under authority to promulgate such regulations "as he *may deem* proper" under the Food and Agriculture Act of 1965 was successfully challenged,

the Supreme Court holding that the action of the Secretary was subject to judicial review. In addition, in Environmental Defense Fund v. Hardin, 138 U. S.App.D.C. 391, 428 F.2d 1093 (1970), the court held that a decision by the Secretary of Agriculture under a provision that he *"may* suspend registration of an economic poison that creates an imminent hazard to the public" was reviewable by the courts. In each of those cases, it should be noted that the permissive verb "may" was used; yet the courts held that the departmental action was subject to judicial review. In accord is Rockbridge v. Lincoln, 449 F.2d 567 (9th Cir. 1971), similarly construing use of the permissive verb "may"; see also Parker v. United States, 448 F.2d 793 (10th Cir. 1971). Such review should be clearer in the instant case because the determination under Title 16, Sec. 1005 is a mandatory requirement.

Following the statement quoted above from *Calvert Cliffs', supra,* at least two Circuit Courts of Appeal have held that district courts have an obligation to review substantive agency decisions on the merits under NEPA. Such was the decision by the Eighth Circuit in *Cache River, supra,* reversing the lower court's denial of an injunction against channelization of that river by the Corps of Engineers. It is noteworthy that, although the court held that plaintiffs could not attack the benefit-cost ratio under the statute authorizing the project since it had been specifically authorized by Congress (whereas it is noted that individual stream channelization projects are not authorized by the Congress), it then held:

> "The relief requested by plaintiffs under (the authorizing statute) is partially available under NEPA. *To fully comply with NEPA, the Corps must reappraise the costs and benefits* of the project in light of the policies of environmental protection found in NEPA. As we have stated, *a decision to proceed with the channelization is reviewable in the District Court to determine whether the actual balance of*

*costs and benefits struck by the agency* according to the standards of §§ 101 and 102 of NEPA *was arbitrary or clearly gave insufficient weight to environmental factors."* (Emphasis supplied.) 473 F.2d at 356 (last paragraph of opinion).

Of similar holding is Conservation Council of North Carolina v. Froehlke (New Hope Dam), 473 F.2d 664 (4th Cir. 1973, reversing on rehearing 4 ERC 1044 (4th Cir. 1972) and 340 F.Supp. 222 (M.D.N.C.1972). The final decision by the Fourth Circuit states,

> "We agree with the Eighth Circuit that: . . . District Courts have an obligation to review substantive agency decisions on the merits to determine if they are in accord with NEPA" . . . limited (to) "determining whether the agency reached its decision after a full, good faith consideration of environmental factors made under the standards set forth in §§ 101 and 102 of NEPA; and whether the actual balance of costs and benefits struck by the agency according to these standards was arbitrary or clearly gave insufficient weight to environmental factors."

The court remanded the case with directions to consider the merits and review the substantive findings of the agency, adding, "Pending rehearing and reconsideration, we direct the District Court to issue immediately a preliminary injunction to restrain and prevent any action which might further change the environment."

To similar effect are Environmental Defense Fund v. TVA (Duck River), 5 ERC 1183 (E.D.Tenn.1973), applying the standard of substantive review to that Corps of Engineers project and Natural Resources Defense Council v. Morton, 337 F.Supp. 170 (D.D.C. 1973), the lower court decision in the oil lease-sale case, subsequent to the D.C. Circuit's opinion referred to above, in which the district court stated it would not substitute its judgment for that of the agency "unless the decision of the

agency is found to be *arbitrary, capricious, or an abuse of discretion, in which case the Court could require the agency to reconsider its decision."* (Emphasis supplied.)[7]

 It seems clear that in the light of present economic conditions and the continuing policy and responsibility of the Federal Government to protect the environment "to the fullest extent possible" as required by NEPA, the courts should review any determination striking a balance of benefits and costs that employs an historically arbitrary interest rate or project life such as is being used in this case. Especially is this true when the authority on which SCS is relying was put into effect as long ago as 1962, long prior to the subsequent Congressional enactment of NEPA. Such an artificial and unrealistic interest rate and unduly long project life prevent determination of the true costs of the Blue-Eye Creek Project; consequently, the marginal benefit-cost balance of 1.05 to 1.00 should be subject to review by the courts as being arbitrary

and capricious in contravention of both the mandate of NEPA and the general standards for review of action by governmental agencies.[8]

 In addition, since the environmental costs of the project will be incurred today as well as in the future, it would seem that, to conform to the mandate of NEPA that they be given sufficient weight, the economic cost of the project must also be computed on the basis of facts as they exist today. Otherwise, in the weighing process dictated by NEPA, see *Calvert Cliffs', supra,* the current environmental costs will not be weighed against the current net economic benefits alleged to accrue from the project, and an arbitrary balance in favor of the project will be achieved. By thus striking a balance against environmental costs, the agency determination will result in giving insufficient weight to environmental values or factors in violation of the above decisions.

SCS apparently concedes that certain costs are to be updated to some date near the present time when they will be

7. While some lower courts have declined to review benefit-cost ratios, it is felt that reliance on those decisions is misplaced here since they in turn rely on statements made in the Gillham Dam case in the District Court in Arkansas, *supra,* which are contrary to the Cache River case subsequently decided by the Eighth Circuit, *supra,* and also on the lower court decision in the New Hope Dam case in North Carolina, which was reversed by the Fourth Circuit. In addition, the theory advanced in those cases has seemed primarily to be that the projects there involved were specifically authorized by Congress. While the Court feels the ratios used in those projects should still be subject to judicial review in order to assure compliance with the pertinent Congressional directives, it notes that watershed projects of the SCS are of a different type since they are not approved by Congress but only by Congressional committees—see the exhibits to the affidavit of Mr. Kenneth E. Grant, Administrator of the SCS, filed in this cause. Without unduly lengthening the discussion of this matter, it must be noted that Congressional committees cannot exercise legislative powers, which are vested by the Constitution only in the Congress itself, nor can they exercise executive powers because of the constitutional requirement of separa-

tion of powers. 37 Ops, Att'y Gen'l 56, 58 (1933) (determining as unconstitutional a bill requiring certain tax refunds to be approved by a joint Congressional committee); Veto message of President Eisenhower, U. S.Code Cong. & Admin.News, 84th Cong., 2d Sess. p. 4836 at 4837 (1956) (determining as unconstitutional an act prohibiting a contract for a small reclamation project if either "appropriate" Congressional committee disapproved of the proposal by resolution). See also R. W. Ginnane, The Control of Federal Administration by Congressional Resolutions and Committees, 66 Harv.L.Rev. 569, 608 (1953), stating, "The arguments against the validity of statutory provisions vesting in legislative committees the power to approve or disapprove proposed actions of executive officers thus seem to be overwhelming." Committee approval of a P.L. 566 watershed project, therefore, in no way can foreclose judicial review of the benefit-cost determination.

8. It matters not whether the benefit-cost balance is reviewed in this case under the authorizing statute (16 U.S.C.A. § 1005) or under NEPA, for the use of an interest rate or project life based only on historical accident would be an arbitrary determination under either statute.

expected to be incurred (see page 2 of the EIS where it is noted that construction costs are computed on a 1971 base). It would, thus, seem only reasonable for interest costs similarly to be updated since the money will be spent today and must be obtained today. In an attempted defense of its computation—made, however, after the EIS had been prepared and, hence, not referred to in it—SCS, through the affidavit of Mr. Todd, contends that it has not reevaluated the benefits from the project and that, if it did so, they would be increased in some undetermined amount. Such a position would seem to be an admission that the interest cost and project life should also be updated to present day rates and criteria.[9]

The Court recognizes that there must necessarily be a zone of administrative discretion where administrative action will not be reversed by the courts. Borrowing from the example set forth by plaintiff, the Court agrees that if there is some dispute as to the value to be assigned for the benefit of a man-day of fishing, as long as that benefit is computed within reasonable bounds, the courts should accept the administrative decision. In this case, however, use of such an historical and unrealistic interest rate and project life is clearly as a matter of law not within the reasonable zone of administrative discretion and, thus, should be subject to judicial review and reversal. The Court recognizes that some courts have expressed fear of esoteric computations or concepts that might enter into determining benefit-cost ratios. However, this is no reason to avoid the problem. Courts in many instances are called upon to determine the permissible bounds of agency discretion and should do no less in a case such as this. Where the administrative decision appears to be within such reason-able bounds, it should be left undisturbed; but where as here, it is highly out-of-line as respects the interest rate and project life, it is the court's function to reverse that determination. To do otherwise would be to abdicate the judicial responsibility to require compliance with the law.

IV. *Failure to Follow Departmental Regulations.*

Plaintiff has contended that, in addition to the matters discussed above, the SCS officials have failed to follow their own departmental regulations in approving the Blue-Eye Creek Project, which regulations were adopted pursuant to the directives of NEPA. Under the requirements of Section 102(2)(B) of NEPA, all agencies, to the fullest extent possible, are directed to:

"identify and develop methods and procedures . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making along with economic and technical considerations;"

In carrying out this mandatory directive, the Secretary of Agriculture, acting through the Administrator of the Soil Conservation Service, promulgated Watersheds Memorandum 108, dated February 4, 1971, which expressly refers to the necessity of carrying out the Congressional directives in NEPA. It should be noted here that the directive that "to the fullest extent possible, the policies, regulations and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act (NEPA)," as set forth in Section 102(1) thereof, and the provisions of Section 102(2)(B) set forth above constitute a requirement of a governmental agency that is sepa-

---

9. This would also be a deficiency in the EIS since such an increase in benefits or explanation of the same is not contained in the EIS. Similarly, SCS in its latest brief advanced the theory that additional benefits might be added from the Appalachian Re-gional Development Act of 1965; again, this is not adverted to in the EIS and, hence, is not available for appraisal by those removed from the decisionmaking process as required by NEPA.

rate and additional to the preparation of a "detailed statement" for agency action under Section 102(2)(C) discussed in Parts I and II of this opinion and, hence, compliance with one does not constitute compliance with the other.

Watersheds Memorandum 108 provides that a stream channel project should be implemented only if all of certain conditions are met, including that the project has (a) "minor or no known adverse effect on the environment", and (b) a "benefit-cost ratio clearly favorable". The EIS, however, shows on its face, in specifically listing six adverse environmental effects of the project which cannot be avoided, that there are known adverse effects on the environment that are not minor. Further, plaintiff has attached to an affidavit filed in his behalf in this case, a letter, dated October 14, 1971, pertaining to the Blue-Eye Creek Watershed from the Alabama State Department of Conservation to Mr. William B. Lingle, State Conservationist of the SCS and one of the defendants in this action, which letter was written after that department reviewed the EIS. That letter serves to show that additional information as to adverse environmental effects of the project have been brought to the SCS's attention. It states, with regard to the destruction of woodlands as a result of the project,

> "This almost complete destruction of woodlands (in the flood plain) will be a most disastrous environmental loss."

Further, as to the effect of the proposed channelization on fishery resources, it is stated,

> "In paragraph 4, page 4 of the environmental statement, 'Detrimental effect to stream fisheries will be minor because habitat values are negligible'

is contrary to evidence available from studies of channelized streams in other areas. Any detrimental effect to a stream fishery which is of low value will further reduce the value and result in a major disaster to the fishery resource of that stream."

And in conclusion,

> "The Alabama Department of Conservation and Natural Resources feels that the environmental resource losses that will result from the structural measures constructed and planned in the Blue-Eye Creek Watershed are not justified by the environmental impact statement."

SCS has not filed any affidavit controverting the fact that this letter was sent or that the contentions made in it have been brought to its attention.[10]

In any event, the EIS shows on its face a benefit-cost ratio of only 1.05 to 1.00, using the defendants' figures, which is certainly not a "clearly favorable" ratio. As noted in Watersheds Memorandum 108, with a "benefit-cost ratio near unity", the project is to be placed in Group 2 rather than Group 1 under that memorandum, which requires that its work plan "be supplemented or revised before scheduling or proceeding with additional construction."

As a result of the foregoing, it appears SCS, according to its own directives required to implement NEPA, has failed to review this marginal project in the proper manner required by those directives. It is also clear that plaintiff whose property is at stake is aggrieved by such failure. Consequently, this project should not be carried out until a proper reappraisal of it and all available alternatives is made in full compliance with those provisions of NEPA reflected in the promulgation of Watersheds Memorandum 108.[11]

---

10. SCS has asserted, in Mr. Todd's affidavit of June 12, 1972, filed in its behalf in this case, that the Alabama State Department of Conservation concurs in findings of the SCS as to justification for the project; but in view of the previous receipt of the depart-

ment's letter, that statement must be in error.

11. While the Court is here dealing with the deficiencies of the EIS that appear on its face and the arbitrary and capricious action

## ORDER

The Court has determined that, as a matter of law appearing on the face of the EIS and from facts as to which there is no genuine issue in dispute, the action of the SCS officials and those acting in concert with them in proposing to implement the channelization project of Blue-Eye Creek, Talledega County, Alabama, is in violation of law for each of the three grounds set forth above, viz. (a) failure to prepare and circulate an adequate "detailed statement" as required by NEPA, (b) failure to comply with the substantive requirements of NEPA as discussed above, and (c) failure to comply with regulations of the Department of Agriculture, specifically Watersheds Memorandum 108, promulgated in response to the requirements of NEPA.

Now, therefore, summary judgment is hereby granted in favor of the plaintiff and it is hereby ordered, adjudged and decreed that the defendants in this action, William B. Lingle, Claude W. Friday, C. W. Munroe and John R. Ellis (including those persons in their official capacities) and all officers, agents, servants and employees and those persons in active concert or participation with them who receive actual notice hereof, as prescribed in Rule 65, Fed.R.Civ. Proc., be, and they hereby are, enjoined and restrained from constructing, installing, or further authorizing or financing any stream modification or channelization of said Blue-Eye Creek pursuant to the so-called Blue-Eye Creek Watershed Project, its work plan or otherwise, until:

(1) An adequate environmental impact statement is prepared, circulated under NEPA as required by law, and presented to and found sufficient by this Court;

(2) In preparing such a statement, the substantive requirements of NEPA as outlined above, are complied with; and

(3) Watersheds Memorandum 108 is also complied with by reappraising the project so as to reduce adverse environmental effects and to develop a more favorable benefit-cost ratio.

For guidance of the defendants in this regard, the Court directs (a) that the alternatives to channelization previously discussed in this opinion, as well as all others that may be reasonably available, be adequately considered and explored, (b) that a project life such as used by SCS in its current watershed projects, viz. 50 years, be employed for this project, and (c) that a realistic current interest rate be employed, which the Court is of the opinion should not be less than that employed for current projects under the directives of the Water Resources Council, the administrative agency setting guidelines for such matters as interest or discount rates for water resource projects assisted by the United States.

The Court retains jurisdiction to assure compliance with this opinion and order.

of SCS in employing certain practices to justify this project, it does not seem out of place to note that opposition to stream channelization comes not only from plaintiff as a landowner seeking to protect the stream on his property and from the Alabama State Department of Conservation but also from other branches of the Federal Government, which have viewed stream channelization with disfavor, as indicated by the quotation from the statement of the Assistant Secretary of the Interior in hearings on stream channelization in 1971 as set forth in plaintiff's brief, as follows: "We need a complete rethink and redirection by the men who are designing and constructing the projects (stream channelization projects) . . . one of the more, if not the most, destructive water development or management practices from the viewpoint of renewable natural resources."